# EXHIBIT A

To re-order this form, call (517) 372-9141
Target Information Management, Inc.
Approved, SCAO

Original - Court
1st copy - Defendant

2nd copy - Plaintiff
3rd copy - Return

| STATE OF MICHIGAN | | |
|---|---|---|
| JUDICIAL DISTRICT | SUMMONS AND COMPLAINT | OAKLAND COUNTY 11-120299-CH |
| 6th JUDICIAL CIRCUIT | | |
| COUNTY PROBATE | | |

JUDGE MICHAEL WARREN
GOLDMAN,LEILA v US BANK NATIO

**Court address**
1200 ± Telegraph, Pontiac, MI.

**Plaintiff name(s), address(es), and telephone no(s).**
Leila Goldman
6533 Post Oak Drive
West Bloomfield, MI. 48322

v

**Defendant name(s), address(es), and telephone no(s).**
US National Bank

**Plaintiff attorney, bar no., address, and telephone no.**
Wolfe Law Group, PLLC
Tace B. Wolfe (P34667)
24901 Northwestern Hwy., Ste 212
Sfld. MI. 48075 (248) 809-2005
(248) 229-1187

**SUMMONS**: NOTICE TO THE DEFENDANT: In the name of the people of the State of Michigan you are notified:
1. You are being sued.
2. YOU HAVE 21 DAYS after receiving this summons to file an answer with the court and serve a copy on the other party or to take other lawful action (28 days if you were served by mail or you were served outside this state).
3. If you do not answer or take other action within the time allowed, judgment may be entered against you for the relief demanded in the complaint.

| Issued JUL 12 2011 | This summons expires OCT 11 2011 | Court clerk BILL BULLARD JR. |
|---|---|---|

*This summons is invalid unless served on or before its expiration date.

**COMPLAINT** Instruction: The following is information that is required to be in the caption of every complaint and is to be completed by the plaintiff. Actual allegations and the claim for relief must be stated on additional complaint pages and attached to this form.

**Family Division Cases**
☐ There is no other pending or resolved action within the jurisdiction of the family division of circuit court involving the family or family members of the parties.
☐ An action within the jurisdiction of the family division of the circuit court involving the family or family members of the parties has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**General Civil Cases**
☒ There is no other pending or resolved civil action arising out of the same transaction or occurrence as alleged in the complaint.
☐ A civil action between these parties or other parties arising out of the transaction or occurrence alleged in the complaint has been previously filed in _____ Court.
The action ☐ remains ☐ is no longer pending. The docket number and the judge assigned to the action are:

| Docket no. | Judge | Bar no. |
|---|---|---|

**VENUE**

| Plaintiff(s) residence (include city, township, or village) | Defendant(s) residence (include city, township, or village) |
|---|---|
| Oakland County | Oakland County |

Place where action arose or business conducted
Oakland County

| Date 7/12/2011 | Signature of attorney/plaintiff |
|---|---|

If you require special accommodations to use the court because of a disability or if you require a foreign language interpreter to help you to fully participate in court proceedings, please contact the court immediately to make arrangements.

MC 01 (6/04) SUMMONS AND COMPLAINT    MCR 2.102(B)(11), MCR 2.104, MCR 2.105, MCR 2.107, MCR 2.113(C)(2)(a), (b), MCR 3.206(A)

OAKLAND COUNTY  11-120299-CH

JUDGE MICHAEL WARREN
GOLDMAN,LEILA  v  US BANK NATIO

### STATE OF MICHIGAN

### IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

LEILA GOLDMAN,

      Plaintiff,

vs.

U.S. BANK NATIONAL ASSOCIATION,
As Trustee, of Harborview 2005-13 Trust Fund,

      Defendant.

Case No. 11-_____CH

Hon. _____

_____/

WOLFE LAW GROUP, PLLC
JACK B. WOLFE (P39667)
Attorneys for Plaintiffs
24901 Northwestern Highway Suite 212
Southfield, MI 48075
(248) 229-1187(m)
(248) 228-6307(m)
(248) 809-2005(w)
(248) 809-9969 (f)
thewolfelawgroup@yahoo.com

DEPUTY COUNTY CLERK

2011 JUL 12  AM 9: 24

RECEIVED FOR FILING
OAKLAND COUNTY

_____

**VERIFIED COMPLAINT FOR INJUNCTIVE, DECLARATORY AND OTHER RELIEF
TO STAY FORECLOSURE SALE**

    No civil action between these parties or other parties arising out of
the transaction or occurrence alleged in the complaint has been
previously filed in this Court.

_____
          Jack B. Wolfe (P39667)

    Plaintiff, by and through her attorneys, Wolfe Law Group, PLLC, by Jack B. Wolfe, and

for her Verified Complaint for Injunctive, Declaratory and Other Relief against defendant, state

as follows:

## JURISDICTION AND VENUE

1.      Plaintiff is widowed and lives at 6533 Post Oak Drive, West Bloomfield, Oakland County, Michigan 48322 (the "Home") as her husband, Jack Goldman, died on October 25, 2009. A copy of the certificate of death for Jack Goldman (the "Deceased") is attached as **Exhibit A.**

2.      Defendant does business in Oakland County, Michigan.

3.      The amount in controversy is more than $25,000.00, exclusive of interest, costs and attorney fees.

4.      Venue is appropriate in this Court because the mortgage loan occurred and the foreclosure process is occurring with regard to the Home in Oakland County, Michigan, the Home is located in Oakland County and all parties either live in or conduct business in Oakland County, Michigan.

## COMMON FACTUAL ALLEGATIONS

5.      Plaintiff hereby incorporates the allegations contained in paragraphs 1-4 as if fully stated herein.

6.      On July 27, 1981, plaintiff and the Deceased purchased the Home for $108,000.00 and recorded a Warranty Deed holding fee simple title as tenants in the entireties. A copy of the Warranty Deed is attached as **Exhibit B.**

7.      On August 22, 2005 (the "Closing"), the Deceased refinanced the Home for $344,000.00 and executed an Adjustable Rate Note (the "Note") to Republic Bank (the "Lender"). The Note is attached as **Exhibit C.**

8.      The Note was not signed by plaintiff but **only** the Deceased.

9.      At the Closing, the Deceased also executed a Mortgage to Mortgage Electronic Registration Systems, Inc. ("MERS"). A copy of the MERS originated Mortgage (the "MOM") is attached as **Exhibit D**.

10.     The MOM was also signed by plaintiff to waive her dower rights but fee simple ownership of the Home at the Closing remained as tenants in the entirety.

11.     The title company closing the loan for the Lender did not have plaintiff quit claim deed her interest to the Deceased prior to or at the time of the Closing.

12.     Since MERS was the mortgagee on the MOM and Republic Bank was the Lender on the Note, there existed a split of ownership between the Note and the Mortgage/MOM as of the Closing.

13.     At the Closing, the Note was **not** indorsed in blank at the Closing on behalf of MERS as evidenced by **Exhibit C**.

14.     Upon information and belief, at no time post the Closing was the Note indorsed in blank to MERS.

15.     The Home since the Closing has lost over $200,000.00 in market value due to the Great Recession.

16.     Defendant was assigned (the "Assignment") the MOM by MERS on February 24, 2011, and then recorded the Assignment. A copy of the recorded Assignment is attached as **Exhibit E**.

17.     At the time of the Assignment, the Note was not indorsed in blank or otherwise on behalf of MERS.

3

18.     On or about June 8, 2011, defendant sent notice (the "Notice") to plaintiff that the Home was to be foreclosed upon on July 12, 2011. A copy of the Notice is attached as **Exhibit F.**

19.     Defendant has chosen to pursue non-judicial foreclosure as opposed to judicial foreclosure to obtain the sale of the Home by the sheriff.

20.     Upon the death of the Deceased, the entireties estate merged into the sole ownership of the plaintiff.

21.     The Note is not indorsed to defendant.

22.     The Assignment of the MOM was a nullity as the MOM was split from the Note and, as a result, MERS assigned nothing to defendant.

**COUNT I**
**INJUNCTIVE RELIEF/SHOW CAUSE HEARING**

23.     Plaintiff hereby incorporates the allegations contained in paragraphs 1-22 above as if more fully stated herein.

24.     Defendant has no standing to foreclose as it has been assigned a Mortgage by MERS that has no force and/or effect given the fact that the Note and the Mortgage were split at the Closing.

25.     Defendant has no standing to foreclose as it does not own the Note or have an ownership interest in the Note.

26.     Defendant cannot foreclose upon the Home as plaintiff is not liable on the Note and the Mortgage cannot be enforced against the Home without plaintiff or an owner of the Home being liable on the Note.

27.     Plaintiff requests that this Court enter a temporary restraining order halting the foreclosure sale scheduled for today and schedule a hearing to compel defendant to demonstrate

4

that defendant has standing to pursue foreclose under the non-judicial foreclosure laws of the State of Michigan and enjoin defendant during the pendency of this case from pursuing non-judicial foreclosure of the Home.

WHEREFORE, plaintiff requests this Court immediately schedule this matter for a show cause hearing compelling defendant to appear in Court and show cause why defendant has standing to pursue foreclosure of the Home by non-judicial sale and enjoin defendant during the pendency of this case from pursuing non-judicial foreclosure of the Home.

## COUNT II
## DECLARATORY RELIEF

28.    Plaintiff hereby incorporates the allegations contained in paragraphs 1-27 above as if more fully stated herein.

29.    Based upon the defects in the chain of title, standing, negotiation of the Note, strict compliance with statutory foreclosure obligations, slander of title and other defects set forth above and in the counts below, it is ripe for this Court to determine and declare that any foreclosure sale must be by judicial process.

WHEREFORE, plaintiff requests this Court declare and adjudge that defendant must only pursue judicial as opposed to non-judicial foreclosure of the Home.

## COUNT III
## SLANDER OF TITLE/QUIET TITLE

30.    Plaintiff hereby restates incorporates the allegations contained in paragraphs 1-29 above as if more fully stated herein.

31.    The MOM was void as of the Closing as it was split from the Note.

32.    MERS had no authority to assign the MOM.

33.    The MOM was void *ab initio*.

34. The Assignment to defendant transferred no right, title or interest of any kind to defendant in the Home.

35. Defendant's attempt to foreclose on the Home by a Mortgage that is void is slander of title.

WHEREFORE, plaintiff respectfully requests that this Court award damages equal to the current fair market value of the Home and treble the damages, award attorney's fees and costs so wrongfully sustained due to the slander of title by defendant by encumbering the Home with the void MOM.

## COUNT IV
### VIOLATION OF FAIR DEBT COLLECTION PRACTICES ACT ("FDCA")
### 15 U.S.C. §1692, et seq.

36. Plaintiff hereby restates incorporates the allegations contained in paragraphs 1-35 above as if more fully stated herein.

37. Defendant is a third party debt collector subject to the FDCA.

38. Defendant by threatening a foreclosure lawsuit is "attempting to collect, (either) directly or indirectly debts within the meaning of the statute. 15 U.S.C. §1692(a)(6); *Heintz v. Jenkins*, 514 U.S.291, 115 S.Ct. 1489 (1995).

39. FDCA was passed to eliminate abusive debt collection practices by debt collectors to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged and to promote consistent State action to protect consumers against debt collection abuse.

40. Under the FDCA, a "consumer" is any natural person obligated or allegedly obligated to pay any debt.

41. Any obligation or alleged obligation of any consumer to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of a transaction and primarily for personal, family, or household purposes are under the FDCA.

42. Under the FDCA, a debt collector is any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is to collect debts, or who regularly collects debts or attempts to collect debts, directly or indirectly, debts owed or due or asserted to be owed or due to another.

43. A debt collector may or may not use any false, deceptive or misleading representation or means in connection with the collection of any debt.

44. A debt collector my not violate the FDCA by using either unfair or unconscionable means to collect or attempt to collect any debt.

45. Any debt collector who fails to comply with the provisions of the FDCA is liable for any actual damages sustained, statutory damages up to $1,000,000.00 for each violation, attorney fees as determined by Court and costs of this action.

46. Defendant has violated the FDCA by use of false representations and deceptive means in pursuing plaintiff for payment of a debt given that the basis of defendant's ability to collect was a mortgage lien that was void *ab initio* and a Note never endorsed to defendant nor executed by plaintiff.

WHEREFORE, plaintiff requests that this Honorable Court grant the following relief as provided for under FDCA, 15 U.S.C. §1692e:

A. Compensatory damages in excess of $375,000.00;

B. Statutory damages in excess of $375,000.00;

C. Punitive damages in excess of $375,000.00;

7

D.      Attorney fees, interest and costs pursuant to statute and incurred in this

action; and,

E.      Grant such other relief as the Court may deem equitable, proper and just.

## PRAYER FOR RELIEF

Plaintiffs request and pray that this Honorable Court order the following relief:

A.      Temporarily restrain the foreclosure sale scheduled for today, July 12, 2011, as

sup[ported by the accompanying motion and brief for ex parte relief;

B.      Immediately schedule this matter for a show cause hearing requiring defendant to

appear in Court and demonstrate how defendant has standing to pursue non-

judicial foreclosure;

C.      Grant plaintiff's request for preliminary injunctive relief at the show cause

hearing based upon the numerous defects in the foreclosure process;

D.      Declare and adjudge that the any foreclosure of the Home must be by judicial

foreclosure and that the MOM is void and slander of title as to the Home;

E.      Find that defendant's alleged mortgage against the Home is slander of title as it is

void;

F.      Find that defendant's alleged mortgage against the Home violates the FDCA and

award damages as requested therein;

G.      Award plaintiff actual costs, interest and attorneys fees; and,

H.      Grant any other relief this Court deems just and appropriate.

## VERIFICATION

The undersigned having read the foregoing complaint can verify that the facts, statements
and allegations contained therein are true and accurate to the best of her knowledge, information

and belief.

/s/Leila Goldman
Leila Goldman


Respectfully submitted,

WOLFE LAW GROUP, PLLC

By: _____
JACK B. WOLFE (P39667)
Attorneys for Plaintiffs
24901 Northwestern Highway Suite 212
Southfield, MI  48075
(248) 229-1187(m)
(248) 228-6307(m)
(248) 809-2005(w)
(248) 809-9969 (f)
thewolfelawgroup@yahoo.com

Dated: July 12, 2011

9

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

LEILA GOLDMAN,                                    Case No. 11-120299-CH

        Plaintiff,                                Hon. Michael Warren

vs.

U.S BANK NATIONAL ASSOCIATION,
As Trustee, of Harborview 2005-13 Trust Fund,

        Defendant

                                          /

WOLFE LAW GROUP, PLLC
Jack B. Wolfe (P39667)
Attorneys for Plaintiff
24901 Northwestern Hwy, Suite 212
Southfield, MI 48075
(248) 229-1187(m)
(248) 228-6307(m)
(248) 809-2005 (w)
(248) 809-9969 (f)
thewolfelawgroup@yahoo.com

                                          /

## **PROOF OF SERVICE**

The undersigned certifies that on Monday, October 3, 2011 copies of the following documents were served by priority mail and overnight express delivery:

- Proposed Temporary Restraining Order and Order to Show Cause;

- Motion for Ex Parte Temporary Restraining Order to Stay Foreclosure Sale Pending Show Cause Hearing as to Why Foreclosure Must Be By Judicial Sale Only

- Brief In Support of Motion For Ex Parte Temporary Restraining Order to Stay Foreclosure Sale Pending Show Cause Hearing as to Why Foreclosure Must Be Judicial Sale Only

- Verified Complaint For Injunctive, Declaratory and Other Relief To Stay Foreclosure Sale

1

- Summons and Complaint

- Oakland County – Case Summary

Via priority mail and overnight express mail serve upon:

US Bank National Association
As Trustee/Of Harborview 2005-13
Trust Fund
400 Countrywide Way
Simi Valley, CA  93065-6298

Dated: 10/3/2011

## CERTIFICATE OF SERVICE

I, Lorraine Riley certify that on October 3, 2011 a copy of all listed documents were served by priority mail and overnight express mail service to all interest parties of record.

Dated: 10/3/2011

Lorraine Riley
Legal Assistant

2

**EXHIBIT A**

12/09/2010   06:52   12488622123          GOLDMAN                                    PAGE  01/01

**STATE OF MICHIGAN**
**DEPARTMENT OF COMMUNITY HEALTH**
**CERTIFICATE OF DEATH**
AMENDED *January 7, 2010

1000434691

STATE FILE NUMBER
**5784**

TYPE/PRINT IN PERMANENT BLACK INK — LF  2872

| | | |
|---|---|---|
| 1. DECEDENT'S NAME (First, Middle, Last) **Jack Goldman** | 2. DATE OF BIRTH (Month, Day, Year) **Mar. 10, 1933** | 3. SEX **Male**  4. DATE OF DEATH (Month, Day, Year) **October 25, 2009** |

DECEDENT

5. NAME AT BIRTH OR OTHER NAME USED FOR PERSONAL/BUSINESS (if same AKA'S if any)

6a. AGE – Last Birthday (Years) **76**  6b. UNDER 1 YEAR MONTHS DAYS  6c. UNDER 1 DAY HOURS  MINUTES

7a. LOCATION OF DEATH (Enter place officially pronounced dead in 7a, 7b, 7c)
7b. HOSPITAL OR OTHER INSTITUTION – Name (if not in either, give street and number and zip code)
**Henry Ford Hospital W.B.**

7b. CITY, VILLAGE, OR TOWNSHIP OF DEATH **West Bloomfield**

7c. COUNTY OF DEATH **Oakland**

8a. CURRENT RESIDENCE – STATE **Michigan**  8b. COUNTY **Oakland**

8c. LOCALITY (check the box that describes the locality) CITY OR VILLAGE  TOWNSHIP  UNINCORPORATED PLACE
(inside limits of) **West Bloomfield**

8d. STREET AND NUMBER (Include Apt. No. if applicable) **4955 Peggy**

8e. ZIP CODE **48322**  9. BIRTHPLACE (City and State or Country) **Bronx NY**  10. SOCIAL SECURITY NUMBER **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**

11. DECEDENT'S EDUCATION – What is the highest degree or level of school completed at the time of death? **PHD**

12. RACE – American Indian, White, Black, etc. (If Asian, give nationality, e.g., Chinese, Filipino, Asian Indian, etc.) (Spell all that apply) **White**

13a. ANCESTRY – Mexican, Cuban, Arab, African, English, French, Dutch, etc. (Spell all that apply) **Russian/Polish**

13b. HISPANIC ORIGIN (Yes or No) **No**

14. WAS DECEDENT EVER IN ARMED FORCES (Yes or No) **No**

15. USUAL OCCUPATION Give kind of work done during most of working life. Do not use retired. **Rabbi**  16. KIND OF BUSINESS OR INDUSTRY **Clergy**

17. MARITAL STATUS – Married, Never Married (Widowed, Divorced (Specify)) **Married**

18. NAME OF SURVIVING SPOUSE (if wife, give maiden name first married) **Liela Hirsch**

PARENTS

19. FATHER'S NAME (First, Middle, Last) **Joseph Goldman**

20. MOTHER'S NAME BEFORE EVER MARRIED (First, Middle Last) **Baila Mittleman**

INFORMANT

21a. INFORMANT'S NAME (Type/Print) **Liela Goldman**  21b. RELATIONSHIP TO DECEDENT **Wife**

21c. MAILING ADDRESS (Street and Number or Rural Route Number, City or Village, State/Zip Code) **4955 Peggy, West Bloomfield MI. 48322**

DISPOSITION

22. METHOD OF DISPOSITION – Burial, Cremation, Entombment, Donation, Removal, Storage (Specify) **Burial**

23a. PLACE OF DISPOSITION (Name of Cemetery, Crematory, or other location) **Hebrew Memorial Park**

23b. LOCATION – City or Village, State **Clinton Twp. MI**

24. SIGNATURE OF MORTUARY SCIENCE LICENSEE **/s/Robert H. Bodzin**  25. LICENSE NUMBER (of Licensee) **400490**

26. NAME AND ADDRESS OF FUNERAL FACILITY **Hebrew Memorial Chapel**  **26840 Greenfield Rd, Oak Park MI 48237**

IDENTIFICATION

27a. CERTIFIER (Check only one)
 X Certifying Physician – To the best of my knowledge, death occurred due to the cause(s) and manner stated.
 Medical Examiner – On the basis of examination, and/or investigation, in my opinion, death occurred at the time, date, and place, and due to the cause(s) and manner stated.
27 X Signature and Title **/s/Razaq Badamosi, MD**

28a. ACTUAL OR PRESUMED TIME OF DEATH **9:17 A M**  28b. PRONOUNCED DEAD ON (Month, Day, Year) **Oct. 25, 2009**  28c. TIME PRONOUNCED DEAD **9:17 A M**

29. MEDICAL EXAMINER CONTACTED? (Yes or No) **No**

30. PLACE OF DEATH (Home, Hospital, Nursing Home, (Specify)) **Hospital**  31. IF HOSPITAL Inpatient, Outpatient, Emergency Room, DOA (Specify) **Inpatient**

27b. DATE SIGNED (Month, Day, Year) **Oct. 28, 2009**  27c. LICENSE NUMBER **4301085440**

32. MEDICAL EXAMINER'S CASE NUMBER (if applicable)

33. NAME OF ATTENDING PHYSICIAN IF OTHER THAN CERTIFIER (Type or Print)

34. NAME AND ADDRESS OF CERTIFYING PHYSICIAN (Type or Print) **Razaq Badamosi, MD, 2799 W. Grand Blvd., Detroit MI 48202**

35a. REGISTRAR'S SIGNATURE **/s/C. Myers**  35b. DATE FILED (Month, Day, Year) **October 30, 2009**

CAUSE OF DEATH

PART I. Enter the chain of events—diseases, injuries, or complications—that directly caused the death. DO NOT enter terminal events such as cardiac arrest, respiratory arrest, or ventricular fibrillation without showing the etiology. Enter only one cause on a line.

36. Approximate interval Between onset and death

If diabetes was an immediate, underlying or contributing cause of death be sure to record diabetes in either Part I or Part II of the cause of death section, as appropriate.

IMMEDIATE CAUSE (Final disease or condition resulting in death)
a. **Cardiopulmonary Arrest**  —  Days
 DUE TO (OR AS A CONSEQUENCE OF)
b. **Myocardial Infarction**  —  Days
 DUE TO (OR AS A CONSEQUENCE OF)

Sequentially list conditions, IF ANY, leading to the cause listed on line a. Enter the UNDERLYING CAUSE (disease or injury that initiated the events resulting in death) LAST.
c.
 DUE TO (OR AS A CONSEQUENCE OF)
d.

PART II. OTHER SIGNIFICANT CONDITIONS contributing to death but not resulting in the underlying cause given in Part I.
**Renal Failure**

37. DID TOBACCO USE CONTRIBUTE TO DEATH? Yes  Probably  No  Unknown

38. IF FEMALE Not pregnant within past year  Pregnant at time of death  Not pregnant, but pregnant within 42 days of death  Not pregnant, but pregnant 43 days to 1 year before death  Unknown if pregnant within the past year

39. MANNER OF DEATH – Accident, Suicide, Homicide, Natural Undetermined or Pending (Specify) **Natural**

40a. WAS AN AUTOPSY PERFORMED? (Yes or No) **No**

40b. WERE AUTOPSY FINDINGS AVAILABLE PRIOR TO COMPLETION OF CAUSE OF DEATH? (Yes or No)

MEDICAL EXAMINER

41a. DATE OF INJURY (Month, Day, Year)  41b. TIME OF INJURY  M  41c. DESCRIBE HOW INJURY OCCURRED

41d. INJURY AT WORK (Yes or No)  41e. PLACE OF INJURY – At home, farm, street, construction site, wooded area, etc. (Specify)  41f. IF TRANSPORTATION INJURY – Driver/Operator, Passenger, Pedestrian, etc. (Specify)  41g. LOCATION – Street or RFD No.  City, Village or Twp.  State

**EXHIBIT B**

**WARRANTY DEED-001**

LIBER **8135** PAGE **863**

(State Bar of Michigan Form)

6×2    **3275**

The Grantor(s)    James R Brougham & Winifred A Brougham
his wife                                              whose address is
821 Water Front Drive, Lancaster, PA    17602
convey(s) and warrant(s) to   Jack Goldman and Liela H. Goldman, his
wife
whose address is    6533 Post Oak Drive, West Bloomfield, MI 48033

the following described premises situated in the           Township
of West Bloomfield            , County of   Oakland
and State of Michigan:

Lot 118 Deerfield Village Subdivision, as recorded in liber 111,
pages 39, 40 and 41 of plats, Oakland County Records

*111-39*

a/k/a  6533 Post Oak Drive
Tax Item No 18-35-228-015

for the sum of ONE HUNDRED EIGHT THOUSAND AND NO/100--($108,000.00)--Dollars

subject to easements and building and use restrictions of record and further subject to a certain mortgage held by De-
Liber 6112, Page 240, Oakland County Records, which mortgage grantees herein agree to
assume and pay.

Dated this   27th      day of     July        , 19 81

Signed in presence of:                              Signed by:

_Renie Harden_                                    _James R. Brougham_
Renie HARDIN                                       James R Brougham

_Fepes E. Rivera_                                 _Winifred A. Brougham_
FeBes E RiverA                                     Winifred A Brougham

**STATE OF ~~MICHIGAN~~ PENNSYLVANIA**    ss.

COUNTY OF   Lancaster

The foregoing instrument was acknowledged before me this  27th   day of   July
19 81   by    James R Brougham & Winifred A Brougham his wife

_Feper E. Rivera_

Notary Public, Pennsylvania                County,
My commission expires:

City Treasurer's Certificate

OAKLAND COUNTY TREASURER'S CERTIFICATE

County Treasurer

STATE OF
MICHIGAN
Dept. of
Taxation

REAL ESTATE
TRANSFER TAX
118.80

| When Recorded Return To: | Send Subsequent Tax Bills To: | Drafted by: Timothy P Neenan, Att |
|---|---|---|
| WEIR, MANUEL, SNYDER & RANKE, INC. (Name) | DETROIT BANK & TRUST | Business Address: P. O. Box 93 Taylor, MI  48180 |
| 7385 Orchard Lake Road (Street Address) | | |
| West Bloomfield, Mich 48033 (City and State) | | |

X 18 35 228 015                                         $118.80

**EXHIBIT C**

# ADJUSTABLE RATE NOTE
### (LIBOR One-Month Index - Payment Caps)

**THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THIS NOTE.**

| August 22, 2005 | Livonia | MICHIGAN |
|---|---|---|
| [Date] | [City] | [State] |

6533 POST OAK DRIVE, West Bloomfield, MI 48322
[Property Address]

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $ 344,000.00 (this amount is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided under the terms of this Note but will never exceed ( One-hundred fifteen percent ) of the Principal amount I originally borrowed. This is called the "Maximum Limit." Lender is Republic Bank

I will make all payments under this Note in the form of cash, check or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

(A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of 1.750%. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

(B) Interest Rate Change Dates

The interest rate I will pay may change on the 1st day of December, 2005 , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

(C) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(D) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding Three and 35 hundredths percentage point(s) 3.350% ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than 9.750%. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

## 3. PAYMENTS

(A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the 1st day of each month beginning on 10/01/2005 . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to Interest before Principal. If, on September 01, 2035 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at P.O. Box 967, Mortgage Payment Center, Jackson, MI 49204 or at a different place if required by the Note Holder.

**(B)  Amount of My Initial Monthly Payments**
Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ 1 , 228 . 92       unless adjusted under Section 3 (F).

**(C)  Payment Change Dates**
My monthly payment may change as required by Section 3(D) below beginning on the  1st       day of  October, 2006      , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below.  If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.
I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**(D)  Calculation of Monthly Payment Changes**
At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and Interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**
Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid Principal can never exceed the Maximum Limit equal to       115 percent of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. This means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**
On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

**(H)  Payment Options**
After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:
(i)    Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.
(ii)   Fully Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.
(iii)  15 Year Amortized Payment: the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.
These Payment Options are only applicable if they are greater than the Minimum Payment.

### 4.    NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### 5.    BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

### 6.    LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

### 7.    BORROWER'S FAILURE TO PAY AS REQUIRED

(A)  Late Charges for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of fifteen (15) calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000 % of my overdue payment of Principal and Interest. I will pay this late charge promptly but only once on each late payment.

(B)  Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

(C)  Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. The date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

(D)  No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

(E)  Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

### 8.    GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by delivering it or by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

### 9.    OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

**10. WAIVERS**

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**11. SECURED NOTE**

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions are described as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
JACK GOLDMAN                                                    -Borrower

_____ (Seal)
                                                                          -Borrower

_____ (Seal)
                                                                          -Borrower

_____ (Seal)
                                                                          -Borrower

PayOption ARM Note LIBOR Index
FE-5310 (0412)                          Page 4 of 4   App Nbr 2049310        Loan Nbr 5106067        10/04

**EXHIBIT D**

# MORTGAGE

Return To:

Republic Bank
31155 Northwestern Highway
Farmington Hills, MI   48334

MIN 100018100020493108

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated **August 22, 2005**
together with all Riders to this document.

(B) "Borrower" is JACK GOLDMAN, A MARRIED MAN AND LIELA H. GOLDMAN, HIS WIFE

Borrower's address is 6533 POST OAK DRIVE, WEST BLOOMFIELD, MI   48322
. Borrower is the mortgagor under this Security Instrument.

5106067                                                                                                    2049310

MICHIGAN-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS          - Form 3023 1/01

VMP-6A(MI) (0401)
Page 1 of 15

Initial:

VMP Mortgage Solutions (800)521-7291

under this Security Instrument. MERS is organized and existing under the       of Delaware, and has an
address and telephone numb       P.O. Box 2026, Flint, MI 48501-2026, tel. (       79-MERS.
(D) "Lender" is Republic Bank

Lender is a **Corporation**
organized and existing under the laws of **The State of Michigan**
Lender's address is **31155 Northwestern Highway, Farmington Hills, MI   48334**

(E) "Note" means the promissory note signed by Borrower and dated **August 22, 2005**
The Note states that Borrower owes Lender **Three Hundred Forty Four Thousand And**
**Zero/100**                                                                           Dollars
(U.S. $ **344,000.00**           ) plus interest. Borrower has promised to pay this debt in regular Periodic
Payments and to pay the debt in full not later than **September 01, 2035**.
(F) "Property" means the property that is described below under the heading "Transfer of Rights in the
Property."
(G) "Loan" means the debt evidenced by the Note, plus interest, any prepayment charges and late charges
due under the Note, and all sums due under this Security Instrument, plus interest.
(H) "Riders" means all Riders to this Security Instrument that are executed by Borrower. The following
Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [ ] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

(I) "Applicable Law" means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final,
non-appealable judicial opinions.
(J) "Community Association Dues, Fees, and Assessments" means all dues, fees, assessments and other
charges that are imposed on Borrower or the Property by a condominium association, homeowners
association or similar organization.
(K) "Electronic Funds Transfer" means any transfer of funds, other than a transaction originated by
check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic
instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit
or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller
machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse
transfers.
(L) "Escrow Items" means those items that are described in Section 3.
(M) "Miscellaneous Proceeds" means any compensation, settlement, award of damages, or proceeds paid
by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i)
damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the
Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the
value and/or condition of the Property.
(N) "Mortgage Insurance" means insurance protecting Lender against the nonpayment of, or default on,
the Loan.
(O) "Periodic Payment" means the regularly scheduled amount due for (i) principal and interest under the
Note, plus (ii) any amounts under Section 3 of this Security Instrument.

5106067                                                                            2049310

Initials:

VMP-6A(MI) (0401)                        Page 2 of 15                              Form 3023 1/01

time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "A" refers to all requirements and restrictio, are imposed in regard to a "federally related mort, je loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "Successor in Interest of Borrower" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

## TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with power of sale, the following described property located in the
                  County              of              Oakland              :
        [Type of Recording Jurisdiction]                    [Name of Recording Jurisdiction]

**Land in the Township of WEST BLOOMFIELD, OAKLAND County, State of MICHIGAN, and is described as follows: Lot 118, of DEERFIELD VILLAGE SUBDIVISION as recorded in Liber 111, Pages 39, 40 and 41 of Plats, OAKLAND County Records.**

**18-35-228-015**

Parcel ID Number: **18-35-228-015**              which currently has the address of
**6533 POST OAK DRIVE**                                                         [Street]
**West Bloomfield**              [City], Michigan **48322**              [Zip Code]
("Property Address"):

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

5106067                                                                          2049310

VMP®-6A(MI) (0401)              Page 3 of 15              Form 3023 1/01

claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any;

5106067

VMP-6A(MI) (0401)

Page 4 of 15

2049310

Form 3023 1/01

insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at time during the term of the Loan, Lender require that Community Association Dues, Fees, an essments, if any, be escrowed by Borrower d such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

5106067                                    2049310

-6A(MI) (0401)              Page 5 of 15          Initials:          Form 3023 1/01

to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the

5106067

2049310

Initials

VMP®-6A(MI) (0401)

Page 6 of 16

Form 3023 1/01

of progress payments as the work is completed. Unless an agreement is made ir ɯiting or Applicable Law requires interest to be paid o      'h insurance proceeds, Lender shall not be re.      'd to pay Borrower any interest or earnings on such ʎroceeds. Fees for public adjusters, or other ɯird parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. Occupancy. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. Preservation, Maintenance and Protection of the Property; Inspections. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. Borrower's Loan Application. Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

5106067                                                                                                      2049310

-6A(MI) (0401)                          Page 7 of 15          Initials                    Form 3023 1/01

this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument, or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

5106067

2049310

Initials

-6A(MI) (0401)

Page 8 of 15

Form 3023 1/01

exchange for sharing or modifying the mortgage insurer's risk, or reducin    sses. If such agreement provides that an affiliate of        Jer takes a share of the insurer's risk in e, ·   ige for a share of the premiums paid to the insurer, ure arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if

5106067                                                                                                    2049310

VMP-6A(MI) (0401)                          Page 9 of 15              Initials                        Form 3023 1/01

any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. **Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly

5106067

-6A(MI) (0401)

Page 10 of 15

Initials:

2049310

Form 3023 1/01

There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. ·

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

17. **Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

18. **Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

19. **Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and

5106067

VMP-6A(MI) (0401)

Page 11 of 15

Initials

2049310

Form 3023 1/01

Instrument, shall continue unchanged. Lender may require that Borrower pay reinstatement sums and expenses in one or more of following forms, as selected by Lender: (a) , (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

20. **Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any

5106067

VMP-6A(MI) (0401)

Page 12 of 15

Initial:

2049310

Form 3023 1/01

The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

**22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.**

**If Lender invokes the power of sale, Lender shall give notice of sale to Borrower in the manner provided in Section 15. Lender shall publish and post the notice of sale, and the Property shall be sold in the manner prescribed by Applicable Law. Lender or its designee may purchase the Property at any sale. The proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.**

**23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall prepare and file a discharge of this Security Instrument. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.**

5106067

-6A(MI) (0401)

Page 13 of 15

Initials

2049310

Form 3023 1/01

Witnesses:

_____   _____(Seal)
                                JACK GOLDMAN                 -Borrower

_____   _____(Seal)
                                LIELA H. GOLDMAN             -Borrower


_____ (Seal)   _____ (Seal)
                        -Borrower                          -Borrower


_____ (Seal)   _____ (Seal)
                        -Borrower                          -Borrower


_____ (Seal)   _____ (Seal)
                        -Borrower                          -Borrower


**5106067**                                          **2049310**

-6A(MI) (0401)              Page 14 of 15              Form 3023 1/01

Acknowledged before me in Wayne
County, Michigan, on Aug      22, 2005                                    by
JACK GOLDMAN , A MAR..... MAN AND LIELA H. GOLDMAN, HIS WIFE

KIMBERLY A. TORTORA
Notary Public - Wayne Co., MI
My Commission Expires: May 23, 2006
Acting in ____Wayne____ Co., MI

Notary Public, State of Michigan,
County of
My commission expires
Acting in the County of Wayne

This instrument was prepared by

John C. Quayle
Republic Bank
2100 S. Main Street
Ann Arbor, MI   48103

5106067

VMP-6A(MI) (0401)

Page 15 of 15

Initials

2049310

Form 3023 1/01

Doc ID#:

# ADJUSTABLE RATE RIDER

### (PayOption LIBOR One-Month Index - Payment Caps)

THIS ADJUSTABLE RATE RIDER is made this 22nd            day of
**August, 2005**      , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to **Republic Bank**
("Lender") of the same date and covering the property described in the Security Instrument and located at:

**6533 POST OAK DRIVE, West Bloomfield, MI   48322**

[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE MAXIMUM LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS: In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agrees as follows:

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES
The Note provides for changes in the interest rate and the monthly payments, as follows:

### 2.   INTEREST
(A) Interest Rate
Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      1.750  %. The interest rate I will pay may change.
The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

(B) Interest Rate Change Dates
The interest rate I will pay may change on the **1st**          day of
**December, 2005**        , and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. The interest rate may change monthly, but the monthly payment is recalculated in accordance with Section 3.

**PayOption LIBOR ARM Rider**
FE-5313 (0505)                    Page 1 of 5 App Nbr 2049310     Loan Nbr 5106067

**(C) Index**

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one month U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in The Wall Street Journal. The most recent index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index".

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(D) Calculation of Interest Rate Changes**

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding **Three and 35 hundredths**     percentage point(s)     **3.350** % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). This rounded amount will be my new interest rate until the next Interest Rate Change Date. My interest will never be greater than     **9.950** %. Beginning with the first Interest Rate Change Date, my interest rate will never be lower than the Margin.

**3.   PAYMENTS**

**(A) Time and Place of Payments**

I will make a payment every month.

I will make my monthly payments on the **1st**          day of each month beginning on **10/01/2005**          . I will make these payments every month until I have paid all the Principal and Interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal If, on **September 01, 2035**    , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at

**P.O. Box 967, Mortgage Payment Center, Jackson, MI   49204**
or at a different place if required by the Note Holder.

**(B) Amount of My Initial Monthly Payments**

Each of my initial monthly payments until the first Payment Change Date will be in the amount of U.S. $ **1,228.92**          unless adjusted under Section 3 (F).

**(C) Payment Change Dates**

My monthly payment may change as required by Section 3(D) below beginning on the **1st**          day of **October, 2006**          , and on that day every 12th month thereafter. Each of these dates is called a "Payment Change Date." My monthly payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different monthly payment. The "Minimum Payment" is the minimum amount Note Holder will accept for my monthly payment which is determined at the last Payment Change Date or as provided in Section 3(F) or 3(G) below. If the Minimum Payment is not sufficient to cover the amount of the interest due then negative amortization will occur.

I will pay the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

**PayOption LIBOR ARM Rider**
**FE-5313 (0505)**                    Page 2 of 5   App Nbr 2049310      Loan Nbr 5106067

**(D)  Calculation of Monthly Payment Changes**

At least 30 days before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the maturity date in substantially equal payments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." Unless Section 3(F) or 3(G) apply, the amount of my new monthly payment effective on a Payment Change Date, will not increase by more than 7.5% of my prior monthly payment. This 7.5% limitation is called the "Payment Cap." This Payment Cap applies only to the Principal and interest payment and does not apply to any escrow payments Lender may require under the Security Instrument. The Note Holder will apply the Payment Cap by taking the amount of my Minimum Payment due the month preceding the Payment Change Date and multiplying it by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) or 3(G) below requires me to pay a different amount, my new Minimum Payment will be the lesser of the Limited Payment and the Full Payment. I also have the option to pay the Full Payment for my monthly payment.

**(E)  Additions to My Unpaid Principal**

Since my monthly payment amount changes less frequently than the interest rate, and since the monthly payment is subject to the payment limitations described in Section 3 (D), my Minimum Payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal, and interest will accrue on the amount of this difference at the interest rate required by Section 2. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3 (A).

**(F)  Limit on My Unpaid Principal; Increased Monthly Payment**

My unpaid Principal can never exceed the Maximum Limit equal to

115 percent ( 115.000% %) of the Principal amount I originally borrowed. My unpaid Principal could exceed that Maximum Limit due to Minimum Payments and interest rate increases. In that event, on the date that my paying my monthly payment would cause me to exceed that limit, I will instead pay a new monthly payment. his means that my monthly payment may change more frequently than annually and such payment changes will not be limited by the 7.5% Payment Cap. The new Minimum Payment will be in an amount that would be sufficient to repay my then unpaid Principal in full on the Maturity Date in substantially equal payments at the current interest rate.

**(G)  Required Full Payment**

On the fifth Payment Change Date and on each succeeding fifth Payment Change Date thereafter, I will begin paying the Full Payment as my Minimum Payment until my monthly payment changes again. I also will begin paying the Full Payment as my Minimum Payment on the final Payment Change Date.

PayOption LIBOR ARM Rider
FE-5313 (0505)                          Page 3 of 5App Nbr 2049310    Loan Nbr 5106067

**(H)  Payment Options**

After the first Interest Rate Change Date, Lender may provide me with up to three (3) additional payment options that are greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)    **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option and it is only available if the interest portion exceeds the Minimum Payment.

(ii)   **Fully Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) at the Maturity Date in substantially equal payments.

(iii)  **15 Year Amortized Payment:** the amount necessary to pay the loan off (Principal and Interest) within a fifteen (15) year term from the first payment due date in substantially equal payments. This monthly payment amount is calculated on the assumption that the current rate will remain in effect for the remaining term.

These Payment Options are only applicable if they are greater than the Minimum Payment.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

Section 18 of the Security Instrument entitled "Transfer of the Property or a Beneficial Interest in Borrower" is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that

PayOption LIBOR ARM Rider
FE-5313 (0505)                    Page 4 of 5 App Nbr 2049310      Loan Nbr 5106067

obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

_____                                    -Borrower
JACK GOLDMAN

_____                                    -Borrower
LIELA H. GOLDMAN

_____                                    -Borrower

_____                                    -Borrower

**PayOption LIBOR ARM Rider**
FE-5313 (0505)                         Page 5 of 5

App Nbr 2049310        Loan Nbr 5106067

**EXHIBIT E**

PAID RECORDED ~ OAKLAND COUNTY
BILL BULLARD JR, CLERK/REGISTER OF DEEDS

## ASSIGNMENT OF MORTGAGE

Goldman, Jack                                                    T&T # 364885F01

   Mortgage Electronic Registration Systems, Inc., 1901 E Voorhees St, Suite C, Danville, IL 61834, for value received, assigns and transfers to: U.S. Bank National Association, As Trustee, Of Harborview 2005-13 Trust Fund, 400 Countrywide Way, Simi Valley, CA 93065-6298, all its right, title and interest in and to a certain real estate mortgage made by Jack Goldman, a married man and Liela H. Goldman, his wife, original mortgagor(s), to Mortgage Electronic Registration Systems, Inc., Mortgagee, dated August 22, 2005, and recorded on September 19, 2005 in Liber 36282 on Page 402, in Oakland County records, Michigan.

Dated: 02-24-2011
In the presence of:                              Signed:

_____                        Mortgage Electronic Registration Systems, Inc.

_____                        By _____
                                                     RENE ROSALES
                                                 Its ASSISTANT SECRETARY

STATE OF _____          )
                             )SS.
COUNTY OF _____         )
This instrument was acknowledged before me in _____ County, State of _____, on this _____ day
of _____ 2011, by _____ its _____ of
Mortgage Electronic Registration Systems, Inc., for the corporation.

                                          _____
                                          _____, Notary public
                                          State of _____, County of _____
                                          My commission expires _____
                                          Acting in the County of _____

| When Recorded Return To: | | Drafted by: Ellen L. Coon |
| Trott & Trott, P.C. | | Trott & Trott, P.C. |
| 31440 Northwestern Highway, Suite 200 | | 31440 Northwestern Highway, Suite 200 |
| Farmington Hills, MI 48334-2525 | | Farmington Hills, MI 48334-2525 |

Charter Township of West Bloomfield:
Legal Description:
Lot 118, of Deerfield Village Subdivision as recorded in Liber 111, Pages 39, 40 and 41 of Plats, Oakland County Records

Tax Parcel No. 18-35-228-015                     111039

Property Address
6533 Post Oak Dr
West Bloomfield, MI 48322-3831

O.K. - L.G.

LIBER42869 PG566

# ACKNOWLEDGMENT

State of California
County of ___Ventura_____ )

On __February 24, 2011__ before me, __Saira Bhamani Notary Public__
(insert name and title of the officer)

personally appeared __Rene Edwardo Rosales_____ ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

SAIRA BHAMANI
Commission # 1921241
Notary Public - California
Los Angeles County
My Comm. Expires Jan 9, 2015

Signature _____ (Seal)

**EXHIBIT F**

Notice Of Mortgage Foreclosure Sale

THIS FIRM IS A DEBT COLLECTOR ATTEMPTING TO COLLECT A DEBT. ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE. PLEASE CONTACT OUR OFFICE AT THE NUMBER BELOW IF YOU ARE IN ACTIVE MILITARY DUTY.

ATTN PURCHASERS: This sale may be rescinded by the foreclosing mortgagee. In that event, your damages, if any, shall be limited solely to the return of the bid amount tendered at sale, plus interest.

MORTGAGE SALE - Default has been made in the conditions of a mortgage made by Jack Goldman, a married man and Liela H. Goldman, his wife, original mortgagor(s), to Mortgage Electronic Registration Systems, Inc., Mortgagee, dated August 22, 2005, and recorded on September 19, 2005 in Liber 36282 on Page 402, and assigned by said Mortgagee to U.S. Bank National Association, As Trustee, Of Harborview 2005-13 Trust Fund as assignee as documented by an assignment, in Oakland county records, Michigan, on which mortgage there is claimed to be due at the date hereof the sum of Three Hundred Seventy-Three Thousand Seven Hundred Sixty-Seven and 58/100 Dollars ($373,767.58), including interest at 3.75% per annum.

Under the power of sale contained in said mortgage and the statute in such case made and provided, notice is hereby given that said mortgage will be foreclosed by a sale of the mortgaged premises, or some part of them, at public vendue, at the place of holding the circuit court within Oakland County, at 09:00 AM, on July 12, 2011.

Said premises are situated in Charter Township of West Bloomfield, Oakland County, Michigan, and are described as: Lot 118, of Deerfield Village Subdivision as recorded in Liber 111, Pages 39, 40 and 41 of Plats, Oakland County Records

The redemption period shall be 6 months from the date of such sale, unless determined abandoned in accordance with MCLA 600.3241a, in which case the redemption period shall be 30 days from the date of such sale.

Dated: June 8, 2011
For more information, please call:
FC-X (248) 593-1302
Trott & Trott, P.C.
Attorneys For Servicer
31440 Northwestern Highway, Suite 200
Farmington Hills, Michigan 48334-2525

File #364885F01

11-120299-CH

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

LEILA GOLDMAN,

               Plaintiff,                              Case No. 11-_____ CH.

vs.                                             Hon. _____

U.S. BANK NATIONAL ASSOCIATION,
As Trustee, of Harborview 2005-13 Trust Fund,

               Defendant.

_____

## BRIEF IN SUPPORT OF MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER TO STAY FORECLOSURE SALE PENDING SHOW CAUSE HEARING AS TO WHY FORECLOSURE MUST BE BY JUDICIAL SALE ONLY

      Plaintiff, by and through her attorneys, Wolfe Law Group, PLLC, by Jack B. Wolfe, and

for her motion for ex parte relief, states the following:

### LEGAL ARGUMENT

      The Michigan Court of Appeals' seminal decision in *Residential Funding Co, LLC v*

*Saurman*, Docket No. 290248, and the companion case of *Bank of New York Trust Co v Messner*,

Docket No. 291443 (collectively "*RFC*"), on April 21, 2011, held that Mortgage Electronic

Registration Systems, Inc. ("MERS") did not have standing to pursue non-judicial foreclosure in

Michigan as MERS had no interest whatsoever in the note which was required under the

applicable foreclosure statute. In footnote 6 of the *RFC* opinion, it appears though that the Court

would allow a non-judicial foreclosure if, prior to the sheriff sale, MERS assigned to a

foreclosing lender who had standing. However, on June 7, 2011, the New York Court of Appeals

for the Second Division issued an opinion in *Bank of New York v Silverberg*, 2011 NY Slip OP

05002 (June 7, 2011), that an assignment of MERS to an assignee for the purpose of foreclosing

is a nullity where MERS has no interest in the note at the time of the assignment distinguishing

1

*Mortgage Elec. Registration Sys., Inc. v Coakley*, 41 AD3d 674 (NY 2007), as the latter case also involved a MERS assignment but, at the time of the assignment, the relevant note was indorsed in blank to MERS, wherein the *Silverberg* case, there was no endorsement of the note whatsoever. While not binding authority on this Court, the *Silverberg* and *Coakley* Opinions are and should be persuasive and provide guidance on this issue for the reason that New York, unlike Michigan, is only a judicial foreclosure state and the New York courts are a respected tribunal on commercial law with the courts in the *Silverberg* and *Coakley* cases applying the same Uniform Commercial Code ("UCC") as in and adopted by Michigan. Simply put, if the note in *RFC* or *Silverberg* had been endorsed in blank when MERS was mortgagee, then both decisions would have been in favor of the foreclosing lender. The need to endorse notes to enforce mortgages is an UCC analysis. The *RFC, Silverberg* and *Coakley* cases are attached to the accompanying motion.

The Michigan Court of Appeals in *Manufacturers Hanover Mortgage Corp v Snell*, 142 Mich App 548, 552 (1985), citing to MCL 600.3180, held that, "[i]n Michigan, foreclosure actions are equitable in nature." The Court held that non-judicial foreclosure, or foreclosure by advertisement, statutes do not involve "state action" and that the purpose of the foreclosure by advertisement scheme is to "become a part of," or otherwise help enforce, the private contract between mortgagor and mortgagee so as to promote mortgage lending in the state. *Id.* at pp. 552-553. The *Hanover* court recognized the availability of equitable defenses in foreclosure and even summary eviction proceedings:

> "The Supreme Court has long held that the mortgagor may hold over after foreclosure by advertisement and test the validity of the sale in the summary proceeding. [citations omitted]. Otherwise the typical mortgagor who faces an invalid foreclosure would be without remedy, being without the financial means to pursue the alternate course of filing an independent action to restrain or set aside the sale. [citations omitted]. The mortgagor

2

may raise whatever defenses are available in a summary eviction proceeding. MCL 600.5714; *Federal National Mortgage Ass'n v Wingate*, 404 Mich 661, 676, n.5, 273 NW2d 456 (1979). The district court has jurisdiction to hear and determine equitable claims and defenses involving the mortgagor's interest in the property. MCL 600.8302(3); DCR 754.7(b)(1)."

*Hanover* at pp. 553-54. Based upon *Hanover, supra*, plaintiff has the right to attack defendant's standing to foreclose requiring defendant to prove it has standing. Defendant will not be able to prove standing since it fails at being the holder of both the mortgage obligations at commencement of the non-judicial foreclosure process.

On the June 7, 2011, the appellate decision in *Silverberg, supra*, defendant homeowners argued that plaintiff lacked standing to sue because it did not own the notes and mortgages when it commenced foreclosure proceedings because neither MERS nor Countrywide ever transferred the notes or endorsed in blank the note described in the consolidation agreement as required by the UCC. *Id* at *2: Defendants also asserted that the mortgages were never properly assigned to plaintiff because MERS, as the nominee for Countrywide, did not have authority to effectuate an assignment of the mortgages. *Id*. Finally, defendants argued that the mortgage and note were bifurcated, or split, rendering the mortgages unenforceable and foreclosure impossible. *Id*. The Court analyzed and opined on the pertinent issues as follows:

"The principal issue ripe for determination by this Court, and which was left unaddressed by the majority in *Matter of MERSCORP*, is whether MERS, as nominee and mortgagee for purposes of recording, can assign the right to foreclose upon a mortgage to a plaintiff in a foreclosure action absent MERS's right to, or possession of, the actual underlying promissory note.

Standing requires an inquiry into whether a litigant has 'an interest . . . in the lawsuit that the law will recognize as a sufficient predicate for determining the issue at the litigant's request.' Where, as here, the issue of standing is raised by a defendant, a plaintiff must prove its standing in order to be entitled to relief. In a mortgage foreclosure action, a plaintiff has standing where it is both the holder or assignee of the subject mortgage and the holder or assignee of the underlying note at the time the action is commenced.

3

"MERS is a construct of the mortgage finance industry created and implemented to facilitate the sale of promissory notes and servicing rights in residential mortgage transactions. But, the architects of MERS did not simply create a modernized system of keeping track of loan transfers. **They also adopted untested, novel terminology for the most important documents that protect lenders and investors claiming liens on real estate**—the mortgage/deed of trust and assignments....The MERS language and assignment policies present courts with a complex bundle of procedural and substantive issues....**MERS and its assignees have repeatedly taken contradictory positions**—sometimes arguing that MERS is only a tracking system with no lending or servicing powers; other times contending that MERS has the right to hold notes, assign or foreclose mortgages; and still other times, MERS and its assignees say that it acts on behalf of its own property interests or simply as the 'nominee' and/or agent of another. These interpretive problems and inconsistencies have provoked some courts to determine the worst possible fate for secured loan buyers—that their mortgages were not effectively transferred or even that **the mortgages have been separated from the note and are no longer enforceable.**"

Survey at pp. 20-21 (emphasis added). Those promissory notes associated with the "no longer enforceable" mortgages, would be unsecured and the properties associated therewith would be free and clear unless the lenders pursued judicial foreclosure and asserted equitable liens. This is what exists in the instant case and how this Court must rule. "A mortgage may be enforced only by, or in behalf of, a person who is entitled to enforce the obligation the mortgage secures." Restatement (Third) of Property, Mortgages §5.4(c). "In general, a mortgage is unenforceable if it is held by one who has no right to enforce the secured obligation." *Id.* at §5.4 cmt. e. Separation of "the obligation from the mortgage results in a practical loss of efficacy of the mortgage." *Id.* at §5.4 cmt. a. If the mortgage obligation is a negotiable note, UCC § 3-203 is generally understood to make the right of enforcement of the promissory note transferable only by delivery of the instrument itself to the transferee. *Id.* at §5.4 cmt. c.

Michigan has adopted the UCC in regards to negotiable instruments. A negotiable instrument such as a promissory note is payable to a specifically identified person as opposed to bearer. MCL 440.3109(2)(a). "An instrument payable to an identified person may become

5

payable to bearer if it is endorsed in blank pursuant to section 3205(c)." MCL 440.3109(3). A promissory note that is payable to a specific person or Lender is not transferred merely by possession; instead, **transfer requires that it be endorsed.** MCL 440.3201(2) (emphasis added). **An endorsement is not made by purchasing a note, or by purchasing a debt, or by an assignment, instead, an endorsement is made by the signature of the specifically identified person to whom the note is owed.** MCL 440.3204 (emphasis added). "When endorsed in blank, an instrument (i.e., the Note) becomes payable to bearer and may be negotiated by transfer of possession alone until specifically endorsed." MCL 440.3205(2). The "'[p]erson entitled to enforce an instrument means…the holder of the instrument'". MCL 440.3301. To be a "holder" of an instrument, one must **possess** the note *and* the note must be payable to the person in possession of the note, or to bearer. MCL 440.1201(20) (definition of holder); MCL 440.3201 (emphasis added).

In the instant case, the "holder" option is not available to MERS because the note was neither payable to MERS, nor has it been endorsed, either specifically to MERS or in blank (e.g. blank endorsement becomes payable to bearer). The case law on this issue is clear that "[i]f MERS is only the mortgagee, without ownership of the mortgage instrument, it does not have an enforceable right." *In re Vargas,* 396 BR 511, 517 (Bankr CD Cal 2008) stating that "[w]hile the note is 'essential,' the mortgage is only 'an incident' to the note", quoting *Carpenter, supra,* 83 U.S. at 275 (1872). "Where negotiable note is secured by mortgage, the note and mortgage are inseparable, and the assignment of the note carries the mortgage with it while an assignment of the mortgage alone is a nullity." *Id.* at 274; *Landmark Nat'l Bank v Kessler,* 216 P3d 158, 166-167 (Kan 2009) ("in the event that a mortgage loan somehow separates interests of the note and

6

no ownership interest in the note and mortgage pass no title therein to the assignee."

In a recent bankruptcy decision in the State of California, *In Re Walker*, Case No. 10-21656 E-11 (May 20, 2010), the court opined that: "Since no evidence of MERS ownership of the underlying note has been offered, and other courts have concluded that MERS does not own the underlying notes, this court is convinced that MERS had no interest it could transfer....Since MERS did not own the underlying note, it could not transfer the beneficial interest of the [mortgage] to another."

## CONCLUSION

Plaintiff has presented above sufficient law and, in its accompanying motion and verified complaint, sufficient facts for this Court to pause and issue a temporary restraining order stopping the Sheriff Sale today by defendant by non-judicial action and to hold a hearing at which defendant is to show cause why it has standing to pursue non-judicial foreclosure as opposed to judicial foreclosure. There is no reason for there to be one more improper foreclosure in the State of Michigan as the judiciary is likely to spend a decade unwinding all the mistakes to date. An ounce of prevention is well worth it. Plaintiff requests that this Court enter the attached proposed TRO and Show Cause order.

Respectfully submitted,
WOLFE LAW GROUP, PLLC

By: _____
JACK B. WOLFE (P39667)
Attorneys for Plaintiffs
24901 Northwestern Highway Suite 212
Southfield, MI 48075
(248) 229-1187(m)
(248) 809-2005(w)
(248) 809-9969 (f)
thewolfelawgroup@yahoo.com

Dated: July 12, 2011

9

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

LEILA GOLDMAN,

               Plaintiff,

vs.

U.S. BANK NATIONAL ASSOCIATION,
As Trustee, of Harborview 2005-13 Trust Fund,

               Defendant.

Case No. 11-_____CH
Hon. _____

_____/

## PROPOSED TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE

At a session of said Court held on
12th day of July, 2011 at 9:00 am:

Present: Hon. _____
              Circuit Court Judge

This Court having reviewed and considered the verified complaint of plaintiff for injunctive, declaratory and other relief, verified motion for an ex parte temporary restraining order and show cause hearing and brief in support thereof, and otherwise being fully advised in the premises;

**IT IS, THEREFORE, ORDERED AS FOLLOWS:**

A.  A temporary restraining order is GRANTED and the non-judicial Sheriff Sale of the subject property located at 6533 Post Oak Drive, West Bloomfield, Oakland County, Michigan 48322 (the "Home") scheduled for today's date shall be stayed pending the show cause hearing date below.

B.  Defendant shall show cause before this Court on July 20, 2011, at 8:30 a.m., why a preliminary injunction and/or declaratory relief should not be entered

during the pendency of this case prohibiting any non-judicial foreclosure sale by defendant of the Home during the pendency of this action.

C.  Plaintiff must serve a copy of the pleadings in this case and this Order on defendant within 5-days of the Show Cause Hearing.

D.  This Order is entered on July 12, 2011, at 9:00 am.


_____
Circuit Court Judge

11-120299-CH

JUDGE MICHAEL WARREN
GOLDMAN,LEILA  v  US BANK NATIO

STATE OF MICHIGAN

IN THE CIRCUIT COURT FOR THE COUNTY OF OAKLAND

LEILA GOLDMAN,

            Plaintiff,

vs.

            Case No. 11-_____CH
            Hon. _____

U.S. BANK NATIONAL ASSOCIATION,
As Trustee, of Harborview 2005-13 Trust Fund,

            Defendant.

_____/

WOLFE LAW GROUP, PLLC
JACK B. WOLFE (P39667)
Attorneys for Plaintiffs
24901 Northwestern Highway Suite 212
Southfield, MI 48075
(248) 229-1187(m)
(248) 228-6307(m)
(248) 809-2005(w)
(248) 809-9969 (f)
thewolfelawgroup@yahoo.com

_____

## MOTION FOR EX PARTE TEMPORARY RESTRAINING ORDER TO STAY FORECLOSURE SALE PENDING SHOW CAUSE HEARING AS TO WHY FORECLOSURE MUST BE BY JUDICIAL SALE ONLY

Plaintiff, by and through her attorneys, Wolfe Law Group, PLLC, by Jack B. Wolfe, and for her motion for ex parte relief, states the following:

1. This motion is supported by the Verified Compliant filed contemporaneously herewith.

2. Defendant does not have standing to pursue non-judicial foreclosure under MCL 600.3204(1)(d) because defendant is neither the owner nor has an ownership interest in the indebtedness or the Note.

3. Defendant does not have standing to pursue non-judicial foreclosure under MCL

1

600.3204(1)(d) because defendant has no right to enforce the MOM as the Assignment of the MOM to defendant by MERS was a nullity.

4.  Defendant is attempting to enforce the Mom against the Home to which plaintiff is the sole owner and is not liable on the Note that defendant is allegedly trying to enforce by foreclosing the MOM.

.5.  Given recent judicial rulings both in state and out of state which have found that MERS and/or its assignee does not have the power to foreclose or must only foreclose judicially, this Court should enjoin temporarily the Sheriff Sale and hold a hearing for defendant to show cause why it has standing under the non-judicial foreclosure laws to foreclose upon the Home.

6.  This Court should temporarily enjoin the Sheriff Sale and hold a hearing for defendant to show cause why it can foreclose against plaintiff whom is not liable on the Note and is the sole owner of the Home due to the death of her husband and the entireties estate transferring by law to her.

7.  This Motion is supported by the accompanying brief.

Respectfully submitted,

WOLFE LAW GROUP, PLLC

By: _____
JACK B. WOLFE (P39667)
Attorneys for Plaintiffs
24901 Northwestern Highway Suite 212
Southfield, MI 48075
(248) 229-1187(m)
(248) 228-6307(m)
(248) 809-2005(w)
(248) 809-9969 (f)
thewolfelawgroup@yahoo.com

Dated: July 12, 2011

2

## STATE OF MICHIGAN

## COURT OF APPEALS

RESIDENTIAL FUNDING CO, LLC, f/k/a
RESIDENTIAL FUNDING CORPORATION,

        Plaintiff-Appellee,

v

GERALD SAURMAN,

        Defendant-Appellant.

FOR PUBLICATION
April 21, 2011
9:00 a.m.

No.  290248
Kent Circuit Court
LC No.  08-011138-AV

BANK OF NEW YORK TRUST COMPANY,

        Plaintiff-Appellee,

v

COREY MESSNER,

        Defendant-Appellant.

No.  291443
Jackson Circuit Court
LC No.  08-003406-AV

Before: WILDER, P.J., and SERVITTO and SHAPIRO, JJ.

SHAPIRO, J.

        These consolidated cases each involve a foreclosure instituted by Mortgage Electronic Registration System (MERS), the mortgagee in both cases.  The sole question presented is whether MERS is an entity that qualifies under MCL 600.3204(1)(d) to foreclose by advertisement on the subject properties, or if it must instead seek to foreclose by judicial process. We hold that MERS does not meet the requirements of MCL 600.3204(1)(d) and, therefore, may not foreclose by advertisement.

### I. BASIC FACTS AND PROCEDURAL HISTORY

        In these cases, each defendant purchased property and obtained financing for their respective properties from a financial institution.  The financing transactions involved loan documentation ("the note") and a mortgage security instrument (the "mortgage instrument"). The original lender in both cases was Homecoming Financial, LLC.

Each note provided for the amount of the loan, the interest rate, methods and requirements of repayment, the identity of the lender and borrower and the like. The mortgage instrument provided for rights of foreclosure of the property by the mortgagee in the event of default on the loan. The lender, though named as the lender in the mortgage security instrument, was not designated therein as the mortgagee. Instead, the mortgage stated that the Mortgage Electronic Registration Systems, Inc ("MERS") "is the mortgagee under this Security Instrument" and it contained several provisions addressing the relationship between MERS and the lender including:

> "MERS" is Mortgage Electronic Registration Systems Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument.

> * * *

> This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower does hereby mortgage, warrant, grant and convey to MERS (solely as nominee for Lender and Lender's successors and assigns) and to the successors and assigns of MERS, with the power of sale, the following described property . . . . Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

Defendants defaulted on their respective notes. Thereafter, MERS began non-judicial foreclosures by advertisement as permitted under MCL 600.3201, et seq., purchased the property at the subsequent sheriff's sales and then quit-claimed the property to plaintiffs as respective successor lenders. When plaintiffs subsequently began eviction actions, defendants challenged the respective foreclosures as invalid, asserting, inter alia, that MERS did not have authority under MCL 600.3204(1)(d) to foreclose by advertisement because it did not fall within any of the three categories of mortgagees permitted to do so under that statute. The district courts denied defendants' assertions that MERS lacked authority to foreclose by statute and their conclusions were affirmed by the respective circuit courts on appeal. We granted leave to appeal in both cases.[1]

---

[1] *Residential Funding Co, LLC v Saurman*, unpublished order of the Court of Appeals, entered May 15, 2009 (Docket No. 290248); *Bank of New York Trust Co v Messner*, unpublished order of the Court of Appeals, entered July 29, 2009 (Docket No. 291443).

## II. ANALYSIS

### A. STANDARD OF REVIEW

We review de novo decisions made on motions for summary disposition,[2] *Coblentz v Novi*, 475 Mich 558, 567; 719 NW2d 73 (2006), as well as a circuit court's affirmance of a district court's decision on a motion for summary disposition. *First of America Bank v Thompson*, 217 Mich App 581, 583; 552 NW2d 516 (1996). We review all affidavits, pleadings, depositions, admissions and other evidence submitted by the parties in the light most favorable to the party opposing the motion, in this case, defendants. *Coblentz*, 475 Mich at 567-568.

> We also review de novo questions of statutory interpretation and application. *Id.* at 567.
> The primary goal of statutory interpretation is to give effect to the intent of the Legislature. This determination is accomplished by examining the plain language of the statute. Although a statute may contain separate provisions, it should be read as a consistent whole, if possible, with effect given to each provision. If the statutory language is unambiguous, appellate courts presume that the Legislature intended the meaning plainly expressed and further judicial construction is neither permitted nor required. Statutory language should be reasonably construed, keeping in mind the purpose of the statute. If reasonable minds could differ regarding the meaning of a statute, judicial construction is appropriate. When construing a statute, a court must look at the object of the statute in light of the harm it is designed to remedy and apply a reasonable construction that will best accomplish the purpose of the Legislature. [*JSB Sales Co v Dave's Cakes*, 258 Mich App 520, 526-527; 672 NW2d 181 (2003) (citations omitted).]

### B. MERS BACKGROUND

The parties, in their briefs and at oral argument, explained that MERS was developed as a mechanism to provide for the faster and lower cost buying and selling of mortgage debt. Apparently, over the last two decades, the buying and selling of loans backed by mortgages after their initial issuance had accelerated to the point that those operating in that market concluded that the statutory requirement that mortgage transfers be recorded was interfering with their ability to conduct sales as rapidly as the market demanded. By operating through MERS, these financial entities could buy and sell loans without having to record a mortgage transfer for each transaction because the named mortgagee would never change; it would always be MERS even though the loans were changing hands. MERS would purportedly track the mortgage sales internally so as to know for which entity it was holding the mortgage at any given time and, if

---

[2] In Docket No. 290248, the district court granted summary disposition under MCR 2.116(C)(10). In Docket No. 291443, the district court granted summary disposition under MCR 2.116(I)(2) ("If it appears to the court that the opposing party, rather than the moving party, is entitled to judgment, the court may render judgment in favor of the opposing party.").

3

foreclosure was necessary, after foreclosing on the property, would quit claim the property to whatever lender owned the loan at the time of foreclosure.

As described by the Court of Appeals of New York, in *MERSCORP, Inc v Romaine*, 8 NY3d 90, 96; 861 NE2d 81(2006):

> In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages. Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system.

> The initial MERS mortgage is recorded in the County Clerk's office with "Mortgage Electronic Registration Systems, Inc." named as the lender's nominee or mortgagee of record on the instrument. During the lifetime of the mortgage, the beneficial ownership interest or servicing rights may be transferred among MERS members (MERS assignments), but these assignments are not publicly recorded; instead they are tracked electronically in MERS's private system. In the MERS system, the mortgagor is notified of transfers of servicing rights pursuant to the Truth in Lending Act, but not necessarily of assignments of the beneficial interest in the mortgage. [Footnotes omitted.]

The sole issue in this case is whether MERS, as mortgagee, but not noteholder, could exercise its contractual right to foreclose by means of advertisement.

## C. MCL 600.3204(1)(d)

Foreclosure by advertisement is governed by MCL 600.3204(1)(d), which provides, in pertinent part:

> [A] party may foreclose a mortgage by advertisement if all of the following circumstances exist:
>
>       * * *
>
> (d) The party foreclosing the mortgage is either the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage.

The parties agree that MERS is neither the owner of the indebtedness, nor the servicing agent of the mortgage. Therefore, MERS lacked the authority to foreclose by advertisement on defendants' properties unless it was "the owner . . . of an interest in the indebtedness secured by the mortgage." MCL 600.3204(1)(d).

The question, then, is what being the "owner . . . of an interest in the indebtedness secured by the mortgage" requires. According to Black's Law Dictionary, to "own" means "[t]o have good legal title; to hold as property; to have a legal or rightful title to." Black's Law

Dictionary (6th ed). That text defines an "interest" as "the most general term that can be employed to denote a right, claim, title or legal share in something". "Indebtedness" is defined as "[t]he state of being in debt . . . the owing of a sum of money upon a certain and express agreement."

In these cases, a promissory note was exchanged for loans of $229,950 and $207,575, respectively. Thus, reasonably construing the statute according to its common legal meaning, *JSB Sales Co*, 258 Mich App at 526-527, the defendants' indebtedness is solely based upon the notes because defendants owed monies pursuant to the terms of the notes. Consequently, in order for a party to own an interest in the indebtedness, it must have a legal share, title, or right in the note.

Plaintiffs' suggestion that an "interest in the mortgage" is sufficient under MCL 600.3204(d)(1) is without merit. This is necessarily so, as the indebtedness, i.e., the note, and the mortgage are two different legal transactions providing two different sets of rights, even though they are typically employed together. A "mortgage" is "[a] conveyance of title to property that is given as security for the payment of a debt or the performance of a duty and that will become void upon payment or performance according to the stipulated terms." The mortgagee has an interest in the *property*. See *Citizens Mtg Corp v Mich Basic Prop Ins Assoc*, 111 Mich App 393, 397; 314 NW2d 635 (1981) (referencing the "mortgagee's interests in the property"). The mortgagor covenants, pursuant to the mortgage, that if the money borrowed under the note is not repaid, the mortgagee will retain an interest in the *property*. Thus, unlike a note, which evidences a debt and represents the obligation to repay, a mortgage represents an interest in real property contingent on the failure of the borrower to repay the lender. The indebtedness, i.e., the note, and the mortgage are two different things.

Applying these considerations to the present case, it becomes obvious that MERS did not have the authority to foreclose by advertisement on defendants' properties. Pursuant to the mortgages, defendants were the mortgagors and MERS was the mortgagee. However, it was the plaintiff lenders that lent defendants money pursuant to the terms of the notes. MERS, as mortgagee, only held an interest in the *property* as security for the note, not an interest in the note itself. MERS could not attempt to enforce the notes nor could it obtain any payment on the loans on its own behalf or on behalf of the lender. Moreover, the mortgage specifically clarified that, although MERS was the mortgagee, MERS held "only legal title to the interest granted" by defendants in the *mortgage*.[3] Consequently, the interest in the mortgage represented, at most, an interest in defendants' properties. MERS was not referred to in any way in the notes and only Homecomings held the notes. The record evidence establishes that MERS owned neither the notes, nor an interest, legal share, or right in the notes. The only interest MERS possessed was in the properties through the mortgages. Given that the notes and mortgages are separate

---

[3] We note that, in these cases, MERS disclaims any interest in the properties other than the legal right to foreclose and immediately quitclaim the properties to the true owner, i.e., the lender.

5

documents, evidencing separate obligations and interests, MERS' interest in the mortgage did not give it an interest in the debt.

Moreover, plaintiffs' analysis ignores the fact that the statute does not merely require an "interest" in the debt, but rather that the foreclosing party *own* that interest. As noted above, to own means "to have good legal title; to hold as property; to have a legal or rightful title to." None of these terms describes MERS' relationship to the note. Plaintiffs' claim that MERS was a contractual owner of an interest in the notes based on the agreement between MERS and the lenders misstates the interests created by that agreement. Although MERS stood to benefit if the debt was not paid—it stood to become the owner of the property—it received no benefit if the debt was paid. MERS had no right to possess the debt, or the money paid on it. Likewise, it had no right to use or convey the note. Its only "right to possess" was to possess the property if and when foreclosure occurred. Had the lender decided to forgive the debt in the note, MERS would have had no recourse; it could not have sued the lender for some financial loss. Accordingly, it owned no financial interest in the notes. Indeed, it is uncontested that MERS is wholly without legal or rightful title to the debt and that there are no circumstances under which it is entitled to receive any payments on the notes.

The dissent relies on the language in the mortgage instrument to suggest a contractual basis to find that MERS has an ownership interest in the loan. However, the fact that Homecomings gave MERS authority to take "any action required of the Lender" did not transform MERS into an owner of an interest in the notes. Trustees have the authority to take action on behalf of a trust; they can even be authorized to take "any" action. Nevertheless, such authority does not give them an ownership interest in the trust. Moreover, the provision on which the dissent relies (but does not fully quote) contains language limiting MERS to taking action on behalf of the lender's equitable interest in the mortgage instrument.[4] The relevant language provides that the borrower "understands and agrees that MERS holds only legal title *to the interests granted by Borrower in this Security Instrument*" (emphasis added) and gives MERS "the right: to exercise any or all *of those interests* . . . and to take any action required of the Lender including, but not limited to, releasing and canceling this Security Instrument . . . ." (emphasis added). Thus, the contract language expressly limits the interests MERS owns to those granted in the mortgage instrument and limits MERS' right to take action to those actions related to the mortgage instrument. Nothing in this language permits MERS to take any action with respect to the debt, or provides it any interest therein.

Finally, even assuming that the contract language did create such a right, Homecomings cannot grant MERS the authority to take action where the statute prohibits it. Regardless of whether Homecomings would like MERS to be able to take such action, it can only grant MERS

---

[4] Though the lenders do not hold legal title to the mortgage instrument, they do have an equitable interest therein. See *Alton v Slater*, 298 Mich 469, 480; 299 NW 149 (1941); *Atwood v Schlee*, 269 Mich 322; 257 NW 712 (1934). The lender's equitable interest in the mortgage does not, however, translate into an equitable interest for MERS in the loan.

the authority to take actions that our Legislature has statutorily permitted. Where the Legislature has limited the availability to take action to a specified group of individuals, parties cannot grant an entity that falls outside that group the authority to take such actions. Here, the Legislature specifically requires ownership of an interest in the note before permitting foreclosure by advertisement.

The contention that the contract between MERS and Homecomings provided MERS with an ownership interest in the note stretches the concept of legal ownership past the breaking point. While the term may be used very loosely in some popular contexts, such as the expression to "own a feeling," such use refers to some subjective quality or experience. We are confident that such a loose and uncertain meaning is not what the Legislature intended. Rather, the Legislature used the word "owner" because it meant to invoke a legal or equitable right of ownership. Viewed in that context, although MERS owns the mortgage, it owns neither the debt nor an interest in any portion of the debt, and is not a secondary beneficiary of the payment of the debt.[5]

The dissent's conclusion, that MERS owns an interest in the note because whether it ultimately receives the property depends on whether the note is paid, similarly distorts the term "interest" from a legal term of art to a generalized popular understanding of the word. It may be that MERS is concerned with (i.e., interested in) whether the loans are paid because that will define its actions vis-à-vis the properties, but being concerned about whether someone pays his loan is not the same as having a legal right, or even a contingent legal right, to those payments.

Plaintiffs are mistaken in their suggestion that our conclusion that MERS does not have "an interest in the indebtedness" renders that category in the statute nugatory. We need not determine the precise scope of that category, but, by way of example, any party to whom the note has been pledged as security by the lender has "an interest in the indebtedness" because, under appropriate circumstances, it owns the right to the repayment of that loan.

Plaintiffs also argue that MERS had the authority to foreclose by advertisement as the agent or nominee for Homecomings, who held the note and an equitable interest in the mortgage. However, this argument must also fail under the statute because the statute explicitly requires that, in order to foreclose by advertisement, the foreclosing party must possess an interest in the indebtedness. MCL 600.3204(1)(d). · It simply does not permit foreclosure in the name of an agent or a nominee. If the Legislature intended to permit such actions, it could have easily included "agents or nominees of the noteholder" as parties that could foreclose by advertisement.

---

[5] The dissent's analogy between MERS' ability to "own an interest" in the note and an easement-holder's ownership of an interest in land without owning the land is unavailing. An easement holder owns rights to the land that even the landholder cannot infringe upon or divest him of; see *Dobie v Morrison*, 227 Mich App 536, 541; 575 NW2d 817 (1998) (noting that a fee owner cannot use the burdened land in any manner that would interfere with the easement holders' rights), while the interest the dissent contends MERS "owns" would be equal to or less than that of the noteholder and the noteholder could completely divest MERS of the alleged interest by forgiving the note without MERS having any recourse. Accordingly, the analogy fails.

7

Indeed, had the Legislature intended the result suggested by plaintiffs, it would have merely had to delete the word "servicing." The law is clear that this Court must "avoid construction that would render any part of the statute surplusage or nugatory." *Wickens v Oakwood Healthcare Sys*, 465 Mich 53, 60; 631 NW2d 686 (2001). Thus, the Legislature's choice to permit only servicing agents and not all agents to foreclose by advertisement must be given effect.

Similarly, we reject plaintiffs' reliance on *Jackson v Mortgage Electronic Registration Sys, Inc*, 770 NW2d 487 (Minn, 2009). *Jackson*, a Minnesota case, is inapplicable because it interprets a statute that is substantially different from MCL 600.3204. The statute at issue in *Jackson* specifically permits foreclosure by advertisement if "a mortgage is granted to a mortgagee as nominee or agent for a third party identified in the mortgage, and the third party's successors and assigns." *Id.* at 491. Thus, the Minnesota statute specifically provides for foreclosure by advertisement by entities that stand in the exact position that MERS does here. Indeed, the Minnesota statute is "frequently called 'the MERS statute.'" *Id.* at 491. Our statute, MCL 600.3204(1)(d) makes no references to nominees or agents. Rather, it requires that the party foreclosing be either the mortgage servicer or have an ownership interest in the indebtedness. The *Jackson* statute also revolves around the mortgage, unlike MCL 600.3204(1)(d), which uses the term indebtedness, which, as discussed previously, is a reference to the note, not the mortgage. Thus, *Jackson* has no application to the case at bar. Moreover, the Minnesota statute demonstrates that if our Legislature had intended to allow MERS to foreclose by advertisement, they could readily have passed a statute including language like that included in Minnesota.

## D. ANALYSIS BEYOND THE LANGUAGE OF THE STATUTE

Plaintiffs suggest that, despite the plain language of the statute, the Legislature did not create three discrete categories of entities that could foreclose by advertisement. Instead, plaintiffs assert that the Legislature envisioned a *continuum* of entities: those that actually own the loan, those that service the loan, and some ill-defined category which might be called "everything in between." However, courts may not "rewrite the plain statutory language and substitute our own policy decisions for those already made by the Legislature." *DiBenedetto v West Shore Hosp*, 461 Mich 394, 405; 605 NW2d 300 (2000). Thus, without any language in the statute providing for a "continuum," let alone an analysis of what it constitutes, we find no merit in this position.

Plaintiffs also raise a straw man argument by citing this Court's decision in *Davenport v HSBC Bank USA*, 275 Mich App 344; 739 NW2d 383 (2007) where we observed that "[o]ur Supreme Court has explicitly held that '[o]nly the record holder of the mortgage has the power to foreclose' under MCL 600.3204." *Davenport*, 275 Mich App at 347, quoting *Arnold v DMR Financial Services, Inc (After Remand)*, 448 Mich 671, 678; 532 NW2d 852 (1995). However, the facts in *Davenport* do not reflect that the party who held the note was a different party than the party who was the mortgagee. *Davenport*, 275 Mich App at 345. Indeed, the fact that the Court used the term "mortgage" interchangeably with "indebtedness," *id.* at 345-347, rather than distinguishing the two terms, indicates that the same party held both the note and the mortgage. Because the instant cases involve a situation where the noteholder and mortgage holder are separate entities, the general proposition set forth in *Davenport* does not apply. There is nothing

8

in *Davenport* holding that a party that owns only the mortgage and not the note has an ownership interest in the debt.[6]

We also note that *Arnold*, the Supreme Court case relied upon in *Davenport*, was interpreting a previous version of MCL 600.3204, which was substantially revised when the Legislature adopted the version we must apply in this case. The statute as it existed when *Arnold* was decided included a provision stating:

> To entitle any party to give a notice as hereinafter prescribed, and to make such a foreclosure, it shall be requisite:
>
> * * *
>
> (3) That the mortgage containing such power of sale has been duly recorded; and if it shall have been assigned that all the assignments thereof shall have been recorded. [*Arnold*, 448 Mich at 676.]

This requirement, that a noteholder could only foreclose by advertisement if the mortgage they hold is duly recorded, is no longer part of the statute and does not apply in this case. The version of the statute interpreted in *Arnold* also lacked the language, later adopted, and operative in this case, specifically permitting foreclosure by advertisement of the owner of the note. Moreover, the language the Legislature chose to adopt in the amended language appears to reflect an intent to protect borrowers from having their mortgages foreclosed upon by advertisement by those who did not own the note because it would put them at risk of being foreclosed but still owing the noteholder the full amount of the loan.

Under MCL 440.3602, an instrument is only discharged when payment is made "to a person entitled to enforce the instrument." Those parties listed in MCL 600.3204(1)(d)—the servicer, the owner of the debt, or someone owning an interest in the debt—would all be persons entitled to enforce the instrument that reflects the indebtedness. As previously noted, MERS is not entitled to enforce the note. Thus, if MERS were permitted to foreclose on the properties, the borrowers obligated under the note would potentially be subject to double-exposure for the debt. That is, having lost their property to MERS, they could still be sued by the noteholder for the amount of the debt because MERS does not have the authority to discharge the note. MERS members may agree to relinquish the right of collection once foreclosure occurs, but even if they were to do so within MERS, that would not necessarily protect the borrower in the event a lender violated that policy or the note was subsequently transferred to someone other than the lender.[7]

---

[6] In addition, while we reject plaintiffs' overly broad reading of *Davenport* for the reasons just stated, we note that even under that reading, plaintiffs would merely have to obtain assignment of the mortgage from MERS prior to initiating foreclosure proceedings.

[7] The dissent's observation that, had Homecomings remained the mortgagee, it would have had the right to foreclose by advertisement does not change the outcome because the statutory

These risks are, however, not present in a judicial foreclosure. MCL 600.3105(2) provides:

> After a complaint has been filed to foreclose a mortgage on real estate or land contract, while it is pending and after a judgment has been rendered upon it, no separate proceeding shall be had for the recovery of the debt secured by the mortgage, or any part of it, unless authorized by the court.

Thus, once a judicial foreclosure proceeding on the mortgage has begun, a subsequent action on the note is prohibited, absent court authorization, thereby protecting the mortgagor from double recovery. See *Church & Church Inc v A-1 Carpentry*, 281 Mich App 330, 341-342; 766 NW2d 30 (2008), aff'd in part, vacated in part, and aff'd on other grounds in part, 483 Mich 885 (2009); *United States v Leslie*, 421 F2d 763, 766 (CA6, 1970) ("[I]t is the purpose of the statute to force an election of remedies which if not made would create the possibility that the mortgagee could foreclose the mortgage and at the same time hold the maker of the note personally liable for the debt.").

Given that this risk of double-exposure only occurs where the mortgage holder and the noteholder are separate, the Legislature limited foreclosure by advertisement to those parties that were entitled to enforce the debt instrument, resulting in an automatic credit toward payment on the instrument in the event of foreclosure.[8]

While MERS seeks to blur the lines between itself and the lenders in this case in order to position itself as a party that may take advantage of the restricted tool of foreclosure by advertisement, it has, in other cases, sought to clearly define those lines in order to avoid the responsibilities that come with being a lender. For example, in *MERS v Neb Dep't of Banking and Fin*, 270 Neb 529; 704 NW2d 784 (2005), the Nebraska Department of Banking and Finance asserted that MERS was a mortgage banker and, therefore, subject to licensing and registration requirements. *Id.* at 530. MERS successfully maintained that it had nothing to do with the loans and did not even have an equitable interest in the property, holding only "legal title to the

language provides that it is Homecomings' additional status as the *noteholder* that would give it that right. The question before us is whether a mortgagee that is *not* a noteholder has the right to foreclose by advertisement.

---

[8] The dissent's assertion that MCL 600.3105(2) provides for an election of remedies that prevents this double recovery is erroneous, because that statute governs only judicial foreclosures, not foreclosures by advertisement. MCL 600.3105(2) requires the filing of a complaint, something that does not occur in foreclosure by advertisement. Absent the complaint, there is no time during which a complaint would be "pending" or any judgment that could be "rendered upon it" that would prohibit the filing of any "separate proceeding . . . for the recovery of the debt secured by the mortgage." See also *Cheff v Edwards*, 203 Mich App 557, 560; 513 NW2d 439 (1994) (holding that "foreclosure by advertisement is not a judicial action"). Consequently, the prohibitions expressed in MCL 600.3105(2) would not apply to foreclosure by advertisement and, therefore, would not protect borrowers from double recovery is MERS were permitted to foreclose by advertisement.

10

interests granted by Borrower." *Id.* at 534. The court accepted MERS argument that it is not a lender, but merely a shell designed to make buying and selling of loans easier and faster by disconnecting the mortgage from the loan. *Id.* at 535. Having separated the mortgage from the loan, and disclaimed any interest in the loan in order to avoid the legal *responsibilities* of a lender, MERS nevertheless claims in the instant case that it can employ the *rights* of a lender by foreclosing in a manner that the statute affords only to those mortgagees who also own an interest in the loan. But as the Nebraska court stated in adopting MERS argument, "MERS has no independent right to collect on any debt because MERS itself has not extended any credit, and none of the mortgage debtors owe MERS any money." *Id.* at 535

The separation of the note from the mortgage in order to speed the sale of mortgage debt without having to deal with all the "paper work" of mortgage transfers appears to be the sole reason for MERS' existence. The flip side of separating the note from the mortgage is that it can slow the mechanism of foreclosure by requiring judicial action rather than allowing foreclosure by advertisement. To the degree there were expediencies and potential economic benefits in separating the mortgagee from the noteholder so as to speed the sale of mortgage-based debt, those lenders that participated were entitled to reap those benefits. However, it is no less true that, to the degree that this separation created risks and potential costs, those same lenders must be responsible for absorbing the costs.

### III. CONCLUSION

Defendants were entitled to judgment as a matter of law because, pursuant to MCL 600.3204(1)(d), MERS did not own the indebtedness, own an interest in the indebtedness secured by the mortgage, or service the mortgage. MERS' inability to comply with the statutory requirements rendered the foreclosure proceedings in both cases void *ab initio*. Thus, the circuit courts improperly affirmed the district courts' decisions to proceed with eviction based upon the foreclosures of defendants' properties.

In both Docket No. 290248 and 291443, we reverse the circuit court's affirmance of the district court's orders, vacate the foreclosure proceedings, and remand for further proceedings consistent with this opinion. We do not retain jurisdiction. Defendants, as the prevailing parties, may tax costs. MCR 7.219(A).

/s/ Douglas B. Shapiro
/s/ Deborah A. Servitto

11

# STATE OF MICHIGAN

# COURT OF APPEALS

RESIDENTIAL FUNDING CO, LLC, f/k/a
RESIDENTIAL FUNDING CORPORATION,

        Plaintiff-Appellee,

v

GERALD SAURMAN,

        Defendant-Appellant.

FOR PUBLICATION
April 21, 2011

No.  290248
Kent Circuit Court
LC No.  08-011138-AV

BANK OF NEW YORK TRUST COMPANY,

        Plaintiff-Appellee,

v

COREY MESSNER,

        Defendant-Appellant.

No.  291443
Jackson Circuit Court
LC No.  08-003406-AV

Before: WILDER, P.J., and SERVITTO and SHAPIRO, JJ.

WILDER, J. (*dissenting*).

    Because I conclude that, pursuant to MCL 600.3204(1)(d), Mortgage Electronic Registration System (MERS) was "the owner . . . of an interest in the indebtedness secured by the mortgage" at issue in each of these consolidated cases, I respectfully dissent.

I.

    Defendant Gerald Saurman (Saurman) and defendant Corey Messner (Messner) executed promissory notes in exchange for loans from Homecomings Financial Network (Homecomings). To secure the repayment of the loans, Saurman and Messner executed mortgage agreements that encumbered the properties purchased with the money loaned to them by Homecomings. The mortgage agreements provided that MERS, "solely as the nominee for [Homecomings], its successors and assigns," was the mortgagee under each Security Instrument, and held the legal interests to the properties, and that MERS' interests under each Security Instrument, as nominee for Homecomings, included the right to foreclose and sell the properties. The mortgage agreements also provided that MERS had the obligation "to take any action required of

-1-

[Homecomings], including, but not limited to, releasing and canceling" the Security Instruments. Though it was not the mortgagee, as the Lender, Homecomings retained an equitable interest in the mortgages.

Both Saurman and Messner defaulted on their payments, and MERS initiated non-judicial foreclosure by advertisement under MCL 600.3201 *et seq.* MERS purchased the properties in sheriffs' sales, and subsequently, quitclaimed Saurman's property to Residential Funding Co, LLC (RFC), and Messner's property to Bank of New York Trust Co (BNYT). After the redemption periods expired, RFC and BNYT each sought to obtain possession of the respective properties. During eviction proceedings, Saurman and Messner challenged the foreclosure by MERS, asserting that MERS was not the servicing agent, did not own the indebtedness secured by the mortgage, and did not own an interest in the indebtedness secured by the mortgage as required by MCL 600.3204(1)(d). These arguments were rejected by both the district courts and the circuit courts, and this Court granted leave to appeal.

## II.

This Court reviews de novo a summary disposition ruling and a circuit court's affirmance of a district court's ruling on a motion for summary disposition. *Thorn v Mercy Mem Hosp Corp*, 281 Mich App 644, 647; 761 NW2d 414 (2008); *First of America Bank v Thompson*, 217 Mich App 581, 583; 552 NW2d 516 (1996). Issues of statutory construction are questions of law, which this Court reviews de novo on appeal. *Washington v Sinai Hosp of Greater Detroit*, 478 Mich 412, 417; 733 NW2d 755 (2007). Statutory construction discerns and gives effect to the Legislature's intent. *Potter v McLeary*, 484 Mich 397, 410; 774 NW2d 1 (2009). In determining that intent, the court first looks to the language of the statute. *Id.* The interpretation of the language must accord with the legislative intent. *Bush v Shabahang*, 484 Mich 156, 167; 772 NW2d 272 (2009). As far as possible, the court gives effect to every phrase, clause, and word in the statute. *Id.* "The statutory language must be read and understood in its grammatical context, unless it is clear that something different was intended." *Id.* (quotation marks and citations omitted). Courts read a statute as a whole, and individual words and phrases, while important, are read in the context of the entire legislative scheme. *Id.*

"The interpretation of a contract is also a question of law this Court reviews de novo . . . ." *DaimlerChrysler Corp v G Tech Professional Staffing, Inc*, 260 Mich App 183, 184-185; 678 NW2d 647 (2003). A contract must be interpreted according to its plain and ordinary meaning. *Holmes v Holmes*, 281 Mich App 575, 593; 760 NW2d 300 (2008).

> Under ordinary contract principles if contractual language is clear, construction of the contract is a question of law for the court. If the contract is subject to two reasonable interpretations [or the provisions irreconcilably conflict with each other], factual development is necessary to determine the intent of the parties and summary disposition is therefore inappropriate. If the contract, although inartfully worded or clumsily arranged, fairly admits of but one interpretation, it is not ambiguous. *Meagher v Wayne State Univ*, 222 Mich App 700, 721-722; 565 NW2d 401 (1997); see also *Shaw v City of Ecorse*, 283 Mich App 1, 22; 770 NW2d 31 (2009).

A court may not rewrite clear and unambiguous language under the guise of interpretation. *Woodington v Shokoohi*, 288 Mich App 352, 374; 792 NW2d 63 (2010). Rather, "courts must . . . give effect to every word, phrase, and clause in a contract and avoid an interpretation that would render any part of the contract surplusage or nugatory." *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003).

III.

MCL 600.3204 provides, in relevant part:

(1) . . . a party may foreclose a mortgage by advertisement if all of the following circumstances exist:

(a) A default in a condition of the mortgage has occurred, by which the power to sell became operative.

(b) An action or proceeding has not been instituted, at law, to recover the debt secured by the mortgage or any part of the mortgage; or, if an action or proceeding has been instituted, the action or proceeding has been discontinued; or an execution on a judgment rendered in an action or proceeding has been returned unsatisfied, in whole or in part.

(c) The mortgage containing the power of sale has been properly recorded.

(d) The party foreclosing the mortgage is either the owner of the indebtedness or of an interest in the indebtedness secured by the mortgage or the servicing agent of the mortgage.

There are three categories of parties who may foreclose by advertisement under MCL 600.3204(1)(d): (1) the owner of the indebtedness secured by the mortgage; (2) the servicing agent of the mortgage; and (3) the owner of *an interest* in the indebtedness secured by the mortgage. Because we must give meaning to each of these phrases and each word in the phrases in order to give effect to the Legislature's intent, *Bush v Shabahang*, 484 Mich at 167, it is clear that, the owner of an interest in the indebtedness secured by the mortgage, while accorded the same right to foreclose by advertisement, is a different person or entity, than either the owner of the indebtedness secured by the mortgage or the servicing agent of the mortgage. To "own" means "[t]o have good legal title; to hold as property; to have a legal or rightful title to." Black's Law Dictionary (6th ed), p 1105. "Owner" is defined as, "[the] person in whom is vested the ownership, dominion or title of property; proprietor. He who has dominion as a thing, real or personal, corporeal or incorporeal, which he has a right to enjoy and do with as he pleases, even to spoil or destroy it, as far as the law permits, unless he be prevented by some agreement or covenant which restrains his right." *Id.* Indebtedness is defined as "[t]he state of being in debt" or "the owing of a sum of money upon a certain and express agreement." *Id.* at 768. The indebtedness secured by the mortgages are, in these cases, the promissory notes signed by Saurman and Messner. Thus, the owner of the indebtedness secured by the mortgage owns the debt or the notes. In these cases, the owner of the indebtedness is Homecomings.

-3-

The signature questions presented in these cases are what it means to own "an interest" in the indebtedness secured by the mortgage, i.e., to own an interest in the debt or the note, as opposed to owning the debt or the note, and what entity or person the Legislature meant to refer to when it permitted "the owner of an interest in the indebtedness secured by the mortgage" to have the same ability as the owner of the debt and the servicer of the mortgage to foreclose by advertisement. In general,

> The right to foreclosure by advertisement is statutory. *Calaveras Timber Co v Michigan Trust Co*, 278 Mich 445, 450; 270 NW 743 (1936). Such foreclosures are a matter of contract, authorized by the mortgagor, and ought not to be hampered by an unreasonably strict construction of the law. *Cramer v Metropolitan Sav and Loan Ass'n*, 401 Mich 252, 261; 258 NW2d 20 (1977). Harsh results may and often do occur because of mortgage foreclosure sales, "but we have never held that because thereof, such sale should be enjoined, when no showing of fraud or irregularity is made." *Calaveras Timber Co*, [278 Mich] at 454. [*Church & Church Inc v A-1 Carpentry*, 281 Mich App 330, 339-340 (2008), aff'd in part and vacated in part on other grounds, 483 Mich 885 (2009).]

"Interest" is defined in part as "the most general term that can be employed to denote a right, claim, title or legal share in something. . . .The word 'interest' is used in the Restatement of Property both generically to include varying aggregates of rights, privileges, powers and immunities and distributively to mean any one of them." Black's Law Dictionary (6th ed), p 812. Mortgage is defined as "an interest in land created by a written instrument providing security for the performance of a duty or the payment of a debt." *Id.*, p 1009. Notably, the mortgage operates as a conveyance of the legal title to the mortgagee, but such title is subject to defeasance on payment of the debt or performance of the duty by the mortgagor. *Id* at 1010. In other words, the mortgagee's title is defeated when the debt is paid.

I would conclude that, as mortgagee, MERS owned a contractual interest in the indebtednesss. If the indebtedness is paid in conjunction with the note, MERS has the contractual obligation to cancel the security agreement because its title is defeated. If the indebtedness is not paid, however, MERS has the contractual right and obligation, to exercise the rights granted to it by the mortgagors, including the right to foreclose by advertisement under the statute. In other words, MERS interest in the indebtedness is derived from the fact that its contractual obligations as mortgagee were dependent upon whether the mortgagor met the obligation to pay the indebtedness which the mortgage secured.

According to the Security Instruments, MERS was the nominee of Homecomings, and held its status as mortgagee only in that capacity. "Nominee" is defined as "[a] person designated to act in place of another, usu. in a very limited way . . . [a] party who holds bare legal title for the benefit of others." Black's Law Dictionary, p 1149 (9th ed). Although Saurman and Messner agreed that MERS held "only legal title to the interest granted" in the Security Instruments, the security interest was specifically created to secure performance by Saurman and Messner of the obligation they undertook in the note, namely, to repay the debt. In other words, the security interest created was specifically linked to the debt and specifically created to ensure payment of the debt. Saurman and Messner agreed that "if necessary to comply with law or custom, MERS (as nominee for [Homecomings] . . . ha[d] the right to take

-4-

any action required of [Homecomings], including, but not limited to, releasing and canceling" the Security Instruments.

By conveying the right to take *any* action required of it, Homecomings gave, and MERS received, a greater interest than just an interest in the property as security for the note, namely the contractual right to act for the benefit of Homecomings. MERS's interest in the debt reflected by the note is inextricably linked to its obligations under the mortgage. For example, if Saurman or Messner had satisfied their notes, MERS would have been obligated to cancel the Security Instruments on behalf of Homecomings. Alternatively, if Saurman and Messner had elected to sell their properties without Homecomings' prior written consent, MERS would have had the right to exercise the option to require immediate payment in full of all sums secured by the Security Instruments on behalf of Homecomings. Failure to pay in full would have then given MERS the right to invoke remedies such as foreclosure of the properties, as provided in the Security Instruments. In short, MERS was the contractual owner of an interest in the notes, which were secured by the mortgages.

There is no dispute that, had Homecomings retained its status as mortgagee, it would have been entitled to foreclose by advertisement upon the defaults by Saurman and Messner. Nothing in MCL 600.3204 precludes a noteholder-mortgagee from delegating, by contract, some of its rights and responsibilities under the statute and the mortgage, to a nominee which, while not the owner of the note, and therefore, not holding the identical interest in the note as the noteholder, nevertheless, clearly has an interest in whether the note is paid or defaulted upon.[1]

Finally, it bears noting that, contrary to the majority's contention that permitting MERS to foreclose by advertisement could potentially subject the mortgagors to a double-exposure for the same debt, MCL 600.3105(2) forces and election of remedies, such that Homecomings would be precluded from recovery of any debt secured by the mortgage if a foreclosure proceeding had already been initiated by MERS.

---

[1] In this regard, MERS' interest in the indebtedness is similar to the interest held by one who possesses an easement right. "[A]n easement is a not a possessory right. *Terlecki v Stewart*, 278 Mich App 644, 659-660; 754 NW2d 899 (2008). Rather, "[a]n easement is, by nature, a limited property *interest*. It is a right to use the land burdened by the easement rather than a right to occupy and possess the land as does an estate owner." *Mich Dep't of Natural Res v Carmody-Lahti Real Estate, Inc*, 472 Mich 359, 378-379; 699 NW2d 272 (2005) (internal citations and punctuation omitted)(emphasis added). As one can "own" an easement right and have an interest in land without owning the land, so, too, can MERS "own" an interest in the note held by Homecomings without actually owning the note.

I would conclude that MERS did have the authority to foreclose on defendants' properties by advertisement. I would affirm in each case.

/s/ Kurtis T. Wilder

| Bank of N.Y. v Silverberg |
|---|
| 2011 NY Slip Op 05002 |
| Decided on June 7, 2011 |
| Appellate Division, Second Department |
| Leventhal, J., J. |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| This opinion is uncorrected and subject to revision before publication in the Official Reports. |

Decided on June 7, 2011
### SUPREME COURT OF THE STATE OF NEW YORK
### APPELLATE DIVISION : SECOND JUDICIAL DEPARTMENT
ANITA R. FLORIO, J.P.
THOMAS A. DICKERSON
JOHN M. LEVENTHAL
ARIEL E. BELEN, JJ.

2010-00131
(Index No. 17464-08)

[*1]Bank of New York, etc., respondent,

v

Stephen Silverberg, et al., appellants, et al., defendants.

APPEAL by the defendants Stephen Silverberg and Fredrica Silverberg, in an action to foreclose a mortgage, from an order of the Supreme Court (Denise F. Molia, J.), dated September 24, 2008, and entered in Suffolk County, which denied their motion pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing. Stephen C. Silverberg, PLLC, Uniondale N.Y., for appellants.

McCabe, Weisberg & Conway, P.C., New Rochelle, N.Y. (Lisa
L. Wallace and Doron Zanani of counsel), for respondent.


OPINION & ORDER


LEVENTHAL, J.This matter involves the enforcement of the rules that govern real
property and whether such rules should be bent to accommodate a system that has taken
on a life of its own. The issue presented on this appeal is whether a party has standing to
commence a foreclosure action when that party's assignor—in this case, Mortgage
Electronic Registration Systems, Inc. (hereinafter MERS)—was listed in the underlying
mortgage instruments as a nominee and mortgagee for the purpose of recording, but was
never the actual holder or assignee of the underlying notes. We answer this question in the
negative.

In October 2006 the defendants Stephen Silverberg and Fredrica Silverberg
(hereinafter together the defendants) borrowed the sum of $450,000 from Countrywide
Home Loans, Inc. (hereinafter Countrywide), to purchase residential real property in
Greenlawn, New York (hereinafter the property). The loan was secured by a mortgage on
the property (hereinafter the initial mortgage). The initial mortgage refers to MERS as the
mortgagee for the purpose of recording, and provides that the underlying promissory note
is in favor of Countrywide [FN1]. Further, the initial mortgage provides that "MERS holds
only legal title to the rights granted by the [defendants] . . . but, if necessary to comply with
law or custom," MERS purportedly has the right to foreclose and "to take any action
required of [Countrywide]." On November 2, 2006, the initial mortgage was recorded in
the office of the Suffolk County Clerk.

On April 23, 2007, the defendants executed a second mortgage on the subject
property in favor of MERS, as named mortgagee and nominee of Countrywide. The
defendants [*2]simultaneously executed a note in favor of Countrywide, secured by the
second mortgage. The promissory note secured by the second mortgage provided that

payment would be made to Countrywide, and that Countrywide "may transfer this Note." The second mortgage was recorded in the office of the Suffolk County Clerk on June 12, 2007.

In sections entitled "Borrower's Transfer to Lender of Rights in the Property" set forth in both the initial mortgage and the second mortgage, those documents provide:

"[The Borrowers] understand and agree that MERS holds only legal title to the rights granted by [the Borrowers] in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right:

"(A) to exercise any or all of those rights, [granted by the Borrowers to Countrywide] including, but not limited to, the right to foreclose and sell the Property; and

"(B) to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument."

*Consolidation Agreement*

Also in April 2007, the defendants executed a consolidation agreement in connection with the property in the sum of $479,000 in favor of MERS, as mortgagee and nominee of Countrywide . Countrywide was the named lender and note holder. The consolidation agreement purportedly merged the two prior notes and mortgages into one loan obligation. The consolidation agreement was recorded in the office of the Suffolk County Clerk on June 12, 2007. The consolidation agreement, as with the prior mortgages, recites that MERS was "acting solely as a nominee for [Countrywide] and [Countrywide's] successors and assigns . . . For purposes of recording this agreement, MERS is the mortgagee of record." Countrywide, however, was not a party to the consolidation agreement.

In December 2007 the defendants defaulted on the consolidation agreement. Meanwhile, on April 30, 2008, by way of a "corrected assignment of mortgage," MERS, as Countrywide's nominee, assigned the consolidation agreement to the Bank of New York, as Trustee For the Benefit of the Certificate Holders, CWALT, Inc., Alternate Loan Trust 2007-14-T2, Mortgage Pass-Through Certificates Series 2007-14T2 (hereinafter the

plaintiff). On May 6, 2008, the plaintiff commenced this mortgage foreclosure action against the defendants, among others.

In June 2008 the defendants moved pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing. In support of their motion, the defendants submitted, inter alia, the underlying mortgages, the summons and complaint, the second note, and an attorney's affirmation. In the affirmation, the defendants argued, among other things, that the complaint failed to establish a chain of ownership of the notes and mortgages from Countrywide to the plaintiff. In opposition to the defendants' motion, the plaintiff submitted, inter alia, the corrected assignment of mortgage dated April 30, 2008.

*The Order Appealed From*

In an order dated September 24, 2008, the Supreme Court denied the defendant's motion, concluding that, prior to the commencement of the action, MERS, as Countrywide's nominee, and on Countrywide's behalf, assigned the mortgages described in the consolidation agreement. Hence, the Supreme Court determined that the plaintiff was the owner of the "consolidated Note and Mortgage" and, thus, the proper party to commence the action.

On appeal, the defendants argue that the plaintiff lacks standing to sue because it did not own the notes and mortgages at the time it commenced the foreclosure action. Specifically, the defendants contend that neither MERS nor Countrywide ever transferred or endorsed the notes described in the consolidation agreement to the plaintiff, as required by the Uniform Commercial Code. Moreover, the defendants assert that the mortgages were never properly assigned to the plaintiff because MERS, as nominee for Countrywide, did not have the authority to effectuate an assignment of the mortgages. The defendants further assert that the mortgages and notes were bifurcated, rendering the mortgages unenforceable and foreclosure impossible, and that because of such bifurcation, MERS never had an assignable interest in the notes. The defendants also contend [*3]that the Supreme Court erred in considering the corrected assignment of mortgage because it was not authenticated by someone with personal knowledge of how and when it was created, and was improperly submitted in opposition to the motion.

*MERS*

"In 1993, the MERS system was created by several large participants in the real estate mortgage industry to track ownership interests in residential mortgages" (*Matter of MERSCORP, Inc. v Romaine*, 8 NY3d 90, 96). MERS was intended to "streamline the mortgage process by using electronic commerce to eliminate paper."[FN21] MERS's implementation followed the delays occasioned by local recording offices, which were at times slow in recording instruments because of complex local regulations and database systems that had become voluminous and increasingly difficult to search (*see* Peterson, *Foreclosure, Subprime Mortgage Lending, and the Mortgage Electronic Registration System*, 78 U Cin L Rev 1359, 1366 [2010]).

> "Mortgage lenders and other entities, known as MERS members, subscribe to the MERS system and pay annual fees for the electronic processing and tracking of ownership and transfers of mortgages. Members contractually agree to appoint MERS to act as their common agent on all mortgages they register in the MERS system" (*Matter of MERSCORP, Inc. v Romaine*, 8 NY3d at 96 [internal footnotes omitted]).

The MERS system facilitated the transfer of loans into pools of other loans which were then sold to investors as securities (*see* Peterson, at 1361-1362). MERS delivers savings to the participants in the real estate mortgage industry by allowing those entities to avoid the payment of fees which local governments require to record mortgage assignments (*see* Peterson at 1368-1369).

Lenders identify MERS as nominee and mortgagee for its members' successors and assignees. MERS remains the mortgagee of record in local county recording offices regardless of how many times the mortgage is transferred, thus freeing MERS's members from paying the recording fees that would otherwise be furnished to the relevant localities (*id.*; *see Matter of MERSCORP, Inc. v Romaine*, 8 NY3d at 100). This leaves borrowers and the local county or municipal recording offices unaware of the identity of the true owner of the note, and extinguishes a source of revenue to the localities. According to MERS, any loan registered in its system is "inoculated against future assignments because MERS remains the mortgagee no matter how many times servicing is traded."[FN3] Moreover, MERS does not lend money, does not receive payments on promissory notes, and does not service loans by collecting loan payments.

*Analysis*

Relevant to our determination is the decision of the Court of Appeals in *Matter of MERSCORP, Inc. v Romaine* (8 NY3d 90), which held that the Suffolk County Clerk was compelled to record and index mortgages, assignments of mortgages, and discharges of mortgages that named MERS as the lender's nominee or mortgagee of record. In a concurring opinion, Judge Carmen Beauchamp Ciparick specified that the issue of whether MERS has standing to prosecute a foreclosure action remained for another day (*id.* at 100). In a dissent, former Chief Judge Judith S. Kaye posited that the MERS system raised several concerns, including the elimination of the public records which document mortgage loan ownership (*id.* at 100-105).

The principal issue ripe for determination by this Court, and which was left unaddressed by the majority in *Matter of MERSCORP* (*id.*), is whether MERS, as nominee and mortgagee for purposes of recording, can assign the right to foreclose upon a mortgage to a plaintiff in a foreclosure action absent MERS's right to, or possession of, the actual underlying promissory note.

Standing requires an inquiry into whether a litigant has "an interest . . . in the lawsuit that the law will recognize as a sufficient predicate for determining the issue at the litigant's request" [*4](*Caprer v Nussbaum*, 36 AD3d 176, 182; *see New York State Assn. of Nurse Anesthetists v Novello*, 2 NY3d 207, 211; *Wells Fargo Bank Minn., N.A. v Mastropaolo*, 42 AD3d 239, 242). Where, as here, the issue of standing is raised by a defendant, a plaintiff must prove its standing in order to be entitled to relief (*see U.S. Bank, N.A. v Collymore*, 68 AD3d 752, 753; *Wells Fargo Bank Minn., N.A. v Mastropaolo*, 42 AD3d at 242). In a mortgage foreclosure action, a plaintiff has standing where it is both the holder or assignee of the subject mortgage and the holder or assignee of the underlying note at the time the action is commenced (*see U.S. Bank, N.A. v Collymore*, 68 AD3d at 753; *Countrywide Home Loans, Inc. v Gress*, 68 AD3d 709, 709; *Wells Fargo Bank, N.A. v Marchione*, 69 AD3d 204, 207-208; *Mortgage Elec. Registration Sys., Inc. v Coakley*, 41 AD3d 674, 674; *Federal Natl. Mtge. Assn. v Youkelsone*, 303 AD2d 546, 546-547; *First Trust Natl. Assn. v Meisels*, 234 AD2d 414).

As a general matter, once a promissory note is tendered to and accepted by an

assignee, the mortgage passes as an incident to the note (*see Mortgage Elec. Registration Sys., Inc. v Coakley*, 41 AD3d 674; *Smith v Wagner*, 106 Misc 170, 178 ["assignment of the debt carries with it the security therefor, even though such security be not formally transferred in writing"]; *see also Weaver Hardware Co. v Solomovitz*, 235 NY 321, 331-332 ["a mortgage given to secure notes is an incident to the latter and stands or falls with them"]; *Matter of Falls*, 31 Misc 658, 660, *affd* 66 App Div 616 ["The deed being given as collateral for the payment of the note [,] the transfer of the note carried the security"]).

By contrast, "a transfer of the mortgage without the debt is a nullity, and no interest is acquired by it" (*Merritt v Bantholick*, 36 NY 44, 45; *see Carpenter v Longan*, 83 US 271, 274 [an assignment of the mortgage without the note is a nullity]; *US Bank N.A. v Madero*, 80 AD3d 751, 752; *U.S. Bank, N.A. v Collymore*, 68 AD3d at 754; *Kluge v Fugazy*, 145 AD2d 537, 538 [plaintiff, the assignee of a mortgage without the underlying note, could not bring a foreclosure action]; *Flyer v Sullivan*, 284 App Div 697, 698 [mortgagee's assignment of the mortgage lien, without assignment of the debt, is a nullity]; *Beak v Walts*, 266 App Div 900). A "mortgage is merely security for a debt or other obligation and cannot exist independently of the debt or obligation" (*FGB Realty Advisors v Parisi*, 265 AD2d 297, 298). Consequently, the foreclosure of a mortgage cannot be pursued by one who has no demonstrated right to the debt (*id.*; *see* Bergman on New York Mortgage Foreclosures § 12.05[1][a][1991]).

The defendants contend, among other things, that because the plaintiff failed to provide *proof of recording* of the corrected assignment of the mortgage prior to the commencement of the action, it may be inferred that the plaintiff did not own the notes and mortgages prior to that date. However, this particular contention is without merit, as an assignment of a note and mortgage need not be in writing and can be effectuated by physical delivery (*see LaSalle Bank Natl. Assn. v Ahearn*, 59 AD3d 911, 912). Moreover, " [n]o special form or language is necessary to effect an assignment as long as the language shows the intention of the owner of a right to transfer it'" (*Suraleb, Inc. v International Trade Club, Inc.*, 13 AD3d 612, 612, quoting *Tawil v Finkelstein Bruckman Wohl Most & Rothman*, 223 AD2d 52, 55).

Here, the consolidation agreement purported to merge the two prior notes and

mortgages into one loan obligation. Countrywide, as noted above, was not a party to the consolidation agreement. " Either a written assignment of the underlying note or the physical delivery of the note prior to the commencement of the foreclosure action is sufficient to transfer the obligation, and the mortgage passes with the debt as an inseparable incident'" *(US Bank N.A. v Madero,* 80 AD3d at 753, quoting *U.S. Bank, N.A. v Collymore,* 68 AD3d at 754; *see LaSalle Bank Natl. Assn. v Ahearn,* 59 AD3d at 912). The plaintiff relies upon the language in the consolidation agreement, which provides that MERS was "acting solely as a nominee for [Countrywide] and [Countrywide's] successors and assigns . . . For purposes of recording this agreement, MERS is the mortgagee of record." However, as "nominee," MERS's authority was limited to only those powers which were specifically conferred to it and authorized by the lender (*see* Black's Law Dictionary 1076 [8th ed 2004] [defining a nominee as "(a) person designated to act in place of another, (usually) in a very limited way"]). Hence, although the consolidation agreement gave MERS the right to assign the mortgages themselves, it did not specifically give MERS the right to assign the underlying notes, and the assignment of the notes was thus beyond MERS's authority as nominee or agent of the lender (*see Aurora Loan Servs., LLC v Weisblum,* AD3d, 2011 NY Slip Op 04184, *6-7 [2d Dept 2011]; *HSBC Bank USA v Squitieri,* 29 Misc 3d 1225[A], 2010 NY Slip Op 52000[U]; *LNV Corp. v Madison Real Estate, LLC,* 2010 NY Slip Op 33376[U]; *LPP Mtge. Ltd. [*5]v Sabine Props., LLC,* 2010 NY Slip Op 32367[U]; *Bank of NY v Mulligan,* 28 Misc 3d 1226[A], 2010 NY Slip Op 51509[U]; *OneWest Bank, F.S.B. v Drayton,* 29 Misc 3d 1021; *Bank of N.Y. v Alderazi,* 28 Misc 3d 376, 379-380 [the "party who claims to be the agent of another bears the burden of proving the agency relationship by a preponderance of the evidence"]; *HSBC Bank USA, N.A. v Yeasmin,* 27 Misc 3d 1227[A], 2010 NY Slip Op 50927[U]; *HSBC Bank USA, N.A. v Vasquez,* 24 Misc 3d 1239[A], 2009 NY Slip Op 51814[U]; *Bank of N.Y. v Trezza,* 14 Misc 3d 1201[A], 2006 NY Slip Op 52367[U]; *LaSalle Bank Natl. Assn. v Lamy,* 12 Misc 3d 1191[A], 2006 NY Slip Op 51534[U]; *Matter of Agard,* 444 BR 231; *but see US Bank N.A. v Flynn,* 27 Misc 3d 802).

Therefore, assuming that the consolidation agreement transformed MERS into a mortgagee for the purpose of recording—even though it never loaned any money, never had a right to receive payment of the loan, and never had a right to foreclose on the property upon a default in payment—the consolidation agreement did not give MERS title

to the note, nor does the record show that the note was physically delivered to MERS. Indeed, the consolidation agreement defines "Note Holder," rather than the mortgagee, as the "Lender or anyone who succeeds to Lender's right under the Agreement and who is entitled to receive the payments under the Agreement." Hence, the plaintiff, which merely stepped into the shoes of MERS, its assignor, and gained only that to which its assignor was entitled (*see Matter of International Ribbon Mills* [*Arjan Ribbons*], 36 NY2d 121, 126; *see also* UCC 3-201 ["(t)ransfer of an instrument vests in the transferee such rights as the transferor has therein"]), did not acquire the power to foreclose by way of the corrected assignment.

Notwithstanding the foregoing, the plaintiff contends that case law supports its position that MERS has the power to foreclose, where, as here, MERS is identified in a mortgage as nominee and mortgagee for the purpose of recording. In this regard, the plaintiff relies upon *Mortgage Elec. Registration Sys., Inc. v Coakley* (41 AD3d 674), wherein this Court held that MERS had standing to foreclose a mortgage. In that case, unlike in the current case, the lender had transferred and tendered the promissory note to MERS before the commencement of the foreclosure action (*id.* at 674). Therefore, we held that MERS had standing to bring the foreclosure action because it "was the lawful holder of the promissory note and of the mortgage, which passed as an incident to the promissory note" (*id.* at 674 [citations omitted]). Although that determination was a sufficient basis upon which to conclude that MERS had standing, we elaborated, stating,

> "further support for MERS's standing to commence the action may be found on the face of the mortgage instrument itself. Pursuant to the clear and unequivocal terms of the mortgage instrument, [the mortgagor] expressly agreed without qualification that MERS had the right to foreclose upon the premises in the event of a default" (*id.* at 675).

According to the plaintiff, *Coakley* indicates that this Court has determined that such broad provisions in mortgages, such as the initial mortgage and second mortgage here, standing alone, grant MERS, as nominee and mortgagee for the purpose of recording, the power to foreclose. On the contrary, the *Coakley* decision does not stand for that proposition. This Court's holding in *Coakley* was dependent upon the fact that MERS held the note before commencing the foreclosure action. In the absence of that crucial fact, the language in the mortgage instrument would not have provided "further support" for the

language in the mortgage instrument would not have provided further support for the proposition that MERS had the power to foreclose in that case. Furthermore, the language in the initial mortgage and the second mortgage in this case, purportedly granting MERS the right to foreclose, was superseded by the consolidation agreement. Moreover, as discussed above, the broad language relied upon by the plaintiff cannot overcome the requirement that the foreclosing party be both the holder or assignee of the subject mortgage, and the holder or assignee of the underlying note, at the time the action is commenced.

In sum, because MERS was never the lawful holder or assignee of the notes described and identified in the consolidation agreement, the corrected assignment of mortgage is a nullity, and MERS was without authority to assign the power to foreclose to the plaintiff. Consequently, the plaintiff failed to show that it had standing to foreclose.

MERS purportedly holds approximately 60 million mortgage loans (*see* Michael Powell & Gretchen Morgenson, *MERS? It May Have Swallowed Your Loan*, New York Times, March 5, 2011), and is involved in the origination of approximately 60% of all mortgage loans in the United States (*see* Peterson at 1362; Kate Berry, *Foreclosures Turn Up Heat on MERS*, Am. [*6]Banker, July 10, 2007, at 1). This Court is mindful of the impact that this decision may have on the mortgage industry in New York, and perhaps the nation. Nonetheless, the law must not yield to expediency and the convenience of lending institutions. Proper procedures must be followed to ensure the reliability of the chain of ownership, to secure the dependable transfer of property, and to assure the enforcement of the rules that govern real property.

Accordingly, the Supreme Court should have granted the defendants' motion pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing. Thus, the order is reversed, on the law, and the motion of the defendants Stephen Silverberg and Fredrica Silverberg pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing is granted.
FLORIO, J.P., DICKERSON, and BELEN, JJ., concur.

ORDERED that the order is reversed, on the law, with costs, and the motion of the defendants Stephen Silverberg and Fredrica Silverberg pursuant to CPLR 3211(a)(3) to dismiss the complaint insofar as asserted against them for lack of standing is granted

the complaint insofar as asserted against them for lack of standing is granted.

ENTER:

Matthew G. Kiernan

Clerk of the Court

## Footnotes

**Footnote 1:** The promissory note executed in connection with the initial mortgage is not included in the record.

**Footnote 2:** About Us-Overview, MERS, http://www.mersinc.org/about/index.aspx (last visited Apr. 26, 2011).

**Footnote 3:** *see* About Us-Overview, MERS, http://www.mersinc.org/about/index.aspx (last visited Apr. 26, 2011).

Return to Decision List

| **Mortgage Elec. Registration Sys., Inc. v Coakley** |
| :---: |
| 2007 NY Slip Op 05478 [41 AD3d 674] |
| June 19, 2007 |
| Appellate Division, Second Department |
| Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431. |
| As corrected through Wednesday, August 15, 2007 |

Mortgage Electronic Registration Systems, Inc., Respondent
Carrie Coakley, Appellant, et al., Defendants

—[*1] Patricia Weiss, Sag Harbor, N.Y., for appellant.

Fein, Such & Crane, LLP, Chestnut Ridge, N.Y. (Samit G. Patel and Michael S. Hanusek of counsel), for respondent.

In an action to foreclose a mortgage, the defendant Carrie Coakley appeals from an order of the Supreme Court, Suffolk County (Emerson, J.), dated January 23, 2006, which denied her motion pursuant to CPLR 3211 (a) to dismiss the complaint on the ground, inter alia, that the plaintiff lacked standing to commence the action.

Ordered that the order is affirmed, with costs.

In August 2005 the plaintiff Mortgage Electronic Registration Systems, Inc. (hereinafter MERS), commenced this action to foreclose a mortgage made by the defendant Carrie Coakley in favor of First National Bank of Arizona (hereinafter First National) dated January 8, 2005, to secure her indebtedness in the sum of $1,495,000 pursuant to a promissory note dated January 7, 2005, with respect to the premises

known as 98 Bridies Path, Southampton, New York (hereinafter the premises).
Coakley moved pursuant to CPLR 3211 (a) to dismiss the complaint on the ground,
inter alia, that MERS lacked standing to commence the foreclosure action. The
Supreme Court disagreed and denied the motion. We affirm.

Contrary to the defendant's contentions, the promissory note was a negotiable
instrument within the meaning of the Uniform Commercial Code (hereinafter UCC)
(see UCC 3-104; Slutsky v Blooming Grove Inn, 147 AD2d 208, 212 [1989]). The
record shows that the promissory [*2]note was indorsed by First National over to the
First National Bank of Nevada, then indorsed by First National Bank of Nevada in
blank, and ultimately transferred and tendered to MERS. Therefore, at the time of the
commencement of this action, MERS was the lawful holder of the promissory note
(see UCC 3-204 [1]; Franzese v Fidelity N.Y. FSB, 214 AD2d 646 [1995]), and of the
mortgage, which passed as an incident to the promissory note (see Payne v Wilson, 74
NY 348, 354-355 [1878]; see also Weaver Hardware Co. v Solomovitz, 235 NY 321
[1923]; Matter of Falls, 31 Misc 658, 660 [1900], affd 66 App Div 616 [1901]).
Accordingly, MERS had standing to bring the action.

Moreover, further support for MERS's standing to commence the action may be
found on the face of the mortgage instrument itself. Pursuant to the clear and
unequivocal terms of the mortgage instrument, Coakley expressly agreed without
qualification that MERS had the right to foreclose upon the premises in the event of a
default (see Fairbanks Capital Corp. v Nagel, 289 AD2d 99, 100 [2001]; Airlines
Reporting Corp. v S & N Travel, 238 AD2d 292, 293 [1997]; College Mgt. Co. v
Belcher Oil Co. of N.Y., 159 AD2d 339, 341 [1990]).

The defendant's remaining contentions are without merit. Mastro, J.P., Covello,
Angiolillo and Dickerson, JJ., concur.

# EXHIBIT B

STATE OF MICHIGAN
OAKLAND COUNTY CIRCUIT COURT

LEILA GOLDMAN,                                      Case No. 11-120299-CH
                                                   Hon. Michael Warren

      Plaintiff,

v.

U.S. BANK NATIONAL ASSOCIATION,
As Trustee, of Harborview 2005-13 Trust Fund,

      Defendant.

| | |
|---|---|
| WOLFE LAW GROUP, PLLC | MADDIN, HAUSER, WARTELL, ROTH & HELLER, P.C. |
| By:  Jack B. Wolfe (P39667) | By:  Martin S. Frenkel (P49283) |
| 24901 Northwestern Highway, Suite 212 |     David G. Michael (P68508) |
| Southfield, MI  48075 | 28400 Northwestern Highway, Third Floor |
| (248) 229-1187 | Southfield, MI  48034 |
| thewolfelawgroup@yahoo.com | dgm@maddinhauser.com |
| Attorneys for Plaintiff | Attorneys for Defendant |

## NOTICE OF REMOVAL TO FEDERAL COURT

      Defendant, U.S. Bank National Association, as Trustee, of Harborview 2005-13 Trust Fund, has

filed a notice of removal of this action from this court to the United States District Court for the Eastern

District of Michigan.  A true and correct copy of the notice of removal is attached as **Exhibit A**.

                    Respectfully submitted,

                    MADDIN, HAUSER, WARTELL, ROTH & HELLER, P.C.

                    /s/ David G. Michael
                    Martin S. Frenkel (P49283)
                    David G. Michael (P68508)
                    28400 Northwestern Highway, Third Floor
                    Southfield, MI  48034
                    (248) 354-4030
                    dgm@maddinhauser.com
                    Attorneys for U.S. Bank National Association, as Trustee,
Dated:  November 4, 2011           of Harborview 2005-13 Trust Fund

## PROOF OF SERVICE

I hereby certify that, on November 4, 2011, I electronically filed the foregoing paper with the Clerk

of the Court using the Wiznet E-File & Serve system, which sent notice of filing to Jack B. Wolfe.

Respectfully submitted,

MADDIN, HAUSER, WARTELL, ROTH & HELLER, P.C.

/s/ David G. Michael
Martin S. Frenkel (P49283)
David G. Michael (P68508)
28400 Northwestern Highway, Third Floor
Southfield, MI  48034
(248) 354-4030
dgm@maddinhauser.com
Attorneys for U.S. Bank National Association, as Trustee,
Dated:  November 4, 2011        of Harborview 2005-13 Trust Fund

1149362 v1/11225.0137

# EXHIBIT C

**6533 POST OAK DR WEST BLOOMFIELD MI 48322-3831**

Oakland County®
Property Gateway

4 beds / 4 full baths / 1 half baths / 3701 sq ft

**Residential Property Profile**

18-35-228-015

**Note: Please be advised the data included in Property Gateway originates from multiple local municipalities. Data, in regard to properties, may be classified and updated differently by municipalities. If you have any questions, please contact the local community where the data originated.**

## Owner Information

| | |
|---|---|
| Owner(s) | **: RABBI JACK GOLDMAN & LIELA GOLDMAN** |
| Postal Address | **: 4955 PEGGY ST WEST BLOOMFIELD MI 48322-4446** |

## Location Information

| | | | |
|---|---|---|---|
| Site Address | **: 6533 POST OAK DR WEST BLOOMFIELD MI 48322-3831** | | |
| PIN | **: 18-35-228-015** | Neighborhood Code | **: 060** |
| Municipality | **: Charter Township of West Bloomfield** | | |
| School District | **: 290 WEST BLOOMFIELD SCHLS** | | |
| Class Code | **: 401 RES IMP (Includes prior SI-Suburban Imp.)** | | |

## Property Description

**T2N, R9E, SEC 35 DEERFIELD VILLAGE SUB LOT 118**

## Most Recent Sale Since 1994

| | | | |
|---|---|---|---|
| Date | **: 08/16/2011** | | |
| Amount | **: $377,291** | Liber | **: 43312:216** |
| Grantor | **: GOLDMAN, LIELA H** | | |
| | **GOLDMAN, JACK** | Grantee | **: U S BANK** |

## Tax Information

| | | | |
|---|---|---|---|
| Taxable Value | **: $101,730** | State Equalized Value | **: $101,730** |
| Current Assessed Value | **: $101,730** | Capped Value | **: $114,780** |
| Effective Date For Taxes | **:** | Principal Residence Exemption | **: 0%** |
| **Taxes** | | **Taxes** | |
| Summer | **:** | Summer | **:** |
| Winter | **:** | Winter | **:** |
| Village | **:** | Village | **:** |

## Lot Information

| | | | |
|---|---|---|---|
| Description | **:** | Area | **: 0. ACRES** |

**6533 POST OAK DR WEST BLOOMFIELD MI 48322-3831**



4 beds / 4 full baths / 1 half baths / 3701 sq ft

**Residential Property Profile**

18-35-228-015

**Note: Please be advised the data included in Property Gateway originates from multiple local municipalities. Data, in regard to properties, may be classified and updated differently by municipalities. If you have any questions, please contact the local community where the data originated.**

## Primary Structure

| | | | |
|---|---|---|---|
| Structure | : 2 Story | Living Area | : 3701 SQ FT |
| Ground Floor | : 2212 SQ FT | Year Built | : 1965 |
| Effective Year | : 1978 | Remodel Year | : 1986 |
| Stories | : 2   Story | Rooms | : 10 |
| Bedrooms | : 4 | Full Baths | : 4 |
| Half Baths | : 1 | Fireplaces | : 1 |
| Ext Walls | : Brick/Siding | Basement | : YES - FULL |
| Garage | : ATTACHED - 2  car (611 SQ FT) | Heat | : Forced Heat & Cool |
| Fuel Type | : Gas | Central Air | : Yes |

## Basement Information

| | | | |
|---|---|---|---|
| Finish | : RECREATION ROOM FINISH | Area | : 240 SQ FT |

## Porch Information

| Type | Area |
|---|---|
| CCP  (1 Story) | 228 SQ FT |
| Treated Wood | 133 SQ FT |
| Treated Wood | 402 SQ FT |